313 Ga. 57
FINAL COPY

S21A1188. BATES v. THE STATE.

LaGrua, Justice.

Appellant Larry Bates was convicted of malice murder and other crimes in connection with the shooting death of his neighbor, Paul Wilson, and Wilson's dog. On appeal, Appellant raises four enumerations of error alleging ineffective assistance of counsel: (1) trial counsel pursued meritless defenses; (2) trial counsel failed to file the necessary pre-trial notice to pursue a mental illness defense; (3) trial counsel failed to properly subpoena an expert witness; and (4) trial counsel failed to object to and rebut the State's expert witness.[1] Seeing no reversible error, we affirm.

---

[1] The shooting occurred on July 2, 2017. In August 2017, a Barrow County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, aggravated cruelty to animals, and two counts of possession of a firearm during the commission of a felony. In August 2019, a jury found Appellant guilty on all counts. The trial court sentenced Appellant to serve life in prison for the malice murder count, five years in prison to run consecutive for the aggravated cruelty to animals count, and five years to run consecutive on one count of possession of a firearm during the commission of a felony. The felony murder count was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (5) (434 SE2d 479) (1993). The remaining counts

1. The evidence presented at trial showed that Appellant moved into his girlfriend's home in 2016. A year later, Appellant began accusing his across-the-street neighbors, Paul and Beth Wilson, of allowing their dogs, Scooter and Maggie, to urinate and defecate on his lawn. In May 2017, Appellant made numerous calls to 911 and code enforcement authorities regarding the Wilsons' dogs and also to report "harassment" from the Wilsons in the form of staring and gesturing at Appellant. Officers responding to the 911 and code enforcement calls found no evidence of defecation by the dogs, and the Wilsons denied harassing Appellant and allowing their dogs to urinate or defecate on Appellant's lawn. On May 29, in the presence of a responding officer and another neighbor, Appellant and Wilson shook hands and agreed to let "bygones be bygones."

A month later, Wilson arrived home from work and took the

were merged for sentencing purposes. Appellant filed a timely motion for new trial on September 13, 2019, which was amended on September 14 and October 26, 2020. On February 22, 2021, the trial court held an evidentiary hearing on the motion for new trial. On April 13, 2021, the trial court denied the motion for new trial. Appellant filed a timely notice of appeal to this Court, and the case was docketed to this Court's August 2021 term and submitted for a decision on the briefs.

2

dogs out for their nightly walk. Appellant saw Wilson and his dogs outside Appellant's home. Shortly thereafter, Appellant called 911 and requested an officer to respond to his address because he was "fixing to shoot this son of a b\*\*ch" for "letting his dog piss in [unintelligible] yard." While on the phone with the 911 operator, Appellant fired numerous shots at Wilson, killing both him and Scooter.

Appellant remained on the phone with the 911 operator until officers responded to his home. As seen on the responding officer's bodycam video, the officer handcuffed Appellant in his driveway, and while the officer called EMS, Appellant said, "you're gonna get EMS, and if he dies, he dies, he f\*\*king – he let his dog pee out here and he told me 'haha whatever.'" Appellant further stated, "I shot him, I shot him, I shot him."

EMS determined Wilson was deceased, and the medical examiner determined that Wilson's cause of death was internal injuries from gunshot wounds to the head and torso. The medical examiner also determined that Scooter's cause of death was internal

3

injuries from a gunshot wound to the torso.[2]

Following Appellant's arrest, he agreed to waive his *Miranda*[3] rights and gave a statement to the police. During his interview, Appellant stated he was standing outside his home looking at the stars, and Wilson walked by with his dogs. When the dogs reached Appellant's yard, they began urinating. Appellant verbally confronted Wilson. Words were exchanged, and Appellant turned around to go back into his home. Wilson then said, "that's what I thought, that's what I thought, motherf**ker." Appellant then went inside his home, grabbed his gun, and "went down there and confronted [Wilson]," but Wilson had "walked down the road . . . in front of the neighbor's house." When Appellant reached him, Wilson "bowed his chest" and "start[ed] coming at him," and then Appellant shot Wilson.

Prior to trial, Appellant was evaluated by two psychologists and one psychiatrist to determine whether he was insane at the time

---

[2] The medical examiner testified that he is not a trained veterinarian but that he performed a very limited autopsy on the dog for bullet retrieval.

[3] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

of the shooting, whether his "will was overwhelmed by delusions associated with [post-traumatic stress disorder ('PTSD')] to the extent he suffered with delusional compulsion at the time of the alleged offense,"[4] and whether he was presently competent to stand trial. The doctors determined that Appellant was not insane at the time of the shooting, that he was not suffering from delusional compulsion at the time of the shooting, and that he was presently competent to stand trial.

At trial, Appellant was represented by two attorneys, Jeffrey Sliz and Robert Greenwald. On the morning of trial, trial counsel and the State entered into a stipulation regarding evidence of Appellant's PTSD diagnosis. The first stipulation was that, pursuant to *Collins v. State*, 306 Ga. 464, 466 (2) (831 SE2d 765) (2019), and *Virger v. State*, 305 Ga. 281, 297 (9) (824 SE2d 346) (2019), Appellant's PTSD diagnosis and all related testimony were inadmissible to negate intent or diminish mens rea. The second

---

[4] As explained further below, the evidence at trial showed that Appellant was a combat veteran who was diagnosed with PTSD approximately 10 years prior to the shooting.

5

stipulation was that some testimony regarding Appellant's PTSD diagnosis was admissible. Specifically, the parties agreed that Dr. Iana Dzagnidze could testify regarding Appellant's PTSD treatment at the United States Department of Veterans Affairs ("VA") medical center and that Appellant's VA medical records were admissible as business records, so long as they were relevant. Additionally, the parties stipulated that the three doctors who evaluated Appellant prior to trial could testify regarding their assessments of Appellant, their interpretations and observations of his mental status, and their reports.

During the State's case-in-chief, Appellant's counsel cross-examined several witnesses regarding their knowledge of Appellant's PTSD diagnosis. Specifically, counsel elicited testimony from the following people: (1) Appellant's girlfriend, who testified that Appellant suffered from PTSD, that he was receiving treatment for it, that she occasionally drove him to his appointments at the VA, and that he was prescribed medication for his symptoms; (2) Wilson's wife, who testified that she "could have" made the

statement to an officer investigating the shooting that Appellant "had PTSD and was crazy"; and (3) a neighbor of Appellant, who testified that he and Appellant had discussed Appellant's PTSD. On direct examination, the prosecutor questioned two officers about whether they had a conversation with Wilson's wife regarding Appellant's PTSD at the Wilsons' house after the shooting. One officer did not remember any such conversation. The other officer testified that a conversation did occur, and he told Wilson's wife that he "ha[d] known some people with PTSD and this wasn't indicative of how they would act." Appellant's counsel cross-examined this officer regarding this testimony and elicited an admission from the officer that his opinion was based on knowing just one person with PTSD.

After the State rested, the defense presented the testimony of Louis Rosen. Rosen and Appellant served in the United States Army together and were twice deployed to Iraq. Rosen explained there are no shifts during deployment – "[i]t's always a go, go, go business in Iraq. So you may be out on a mission for 36 hours, get back, and then

36 minutes later have to go back out." He described this as extremely stressful. Rosen also testified that Appellant was injured during his second deployment and that afterward, Appellant's "ability to be the one of reason on a constant basis just was not the same." Rosen testified that Appellant "used to take it upon himself to calm us down. To be like our common grace. And he just was not able to really take that role as much anymore because of the stress that he was enduring." After Appellant's and Rosen's military discharge in 2008, they remained in contact, and Rosen testified that Appellant had received counseling from the VA, but not often enough.

After Rosen's testimony, Appellant's counsel read stipulated portions of Appellant's VA medical records to the jury. These portions included the following: Appellant was first diagnosed with PTSD in 2008 prior to his discharge from the Army. After discharge, Appellant scheduled an appointment for a mental health consultation, but canceled it. A year later, Appellant was referred to a neuropsychologist. Two years later, in 2011, Appellant had a psychiatric consultation with Dr. Dzagnidze during which he was

8

identified as suffering from "psychosocial stress."[5] Appellant met the criteria for intensive outpatient treatment, but declined weekly appointments, preferring to focus on medication management. In 2014, Appellant met with Dr. Dzagnidze and described symptoms of depression and anxiety. A year later, in 2015, Appellant began seeing Dr. Dzagnidze on a more regular basis. During one appointment, Dr. Dzagnidze discontinued one of Appellant's prescribed medications due to self-described adverse side effects. A few months later, Dr. Dzagnidze changed Appellant's diagnosis from PTSD to chronic PTSD. Approximately six months later, in mid-2016, Dr. Dzagnidze noted Appellant's "difficult[ies] getting along with people." A couple months later, Dr. Dzagnidze noted Appellant had nightmares about combat and deployment.

In late 2016, Appellant requested a transfer to the VA clinic in Lawrenceville, and the internal transfer notes requested a 60-minute appointment with a therapist, with a note that Appellant

---

[5] Dr. Dzagnidze did not testify at trial. As explained in Division 2 (c), counsel's failure to properly subpoena Dr. Dzagnidze is the basis for one of Appellant's ineffective assistance of counsel claims.

"needs [a t]reatment plan." A month later, a mental health progress note listed: (1) Appellant's relevant medical conditions as depressive disorder and chronic PTSD; (2) Appellant's "treatment plan problems/needs" as symptoms of PTSD and depression, including his self-report of stress, isolation, withdrawal, nightmares, irritability, agitation, intrusive thoughts, hypervigilance, and anxiety; and (3) Appellant's goal: "'I want my symptoms to decrease.'" Approximately a month before the shooting, Appellant spoke with Dr. Robert Gerardi at the VA about the issues he was having with Wilson and noted that some of the tension may have been his own fault. Appellant also reported ongoing nightmares about combat and someone trying to shoot him, and asked Dr. Dzagnidze for a renewal prescription of one of his medications.

After the reading of his medical records, Appellant took the stand in his own defense. Regarding his military service, Appellant testified he was hit by an improvised explosive device while in Iraq and diagnosed with a mild traumatic brain injury ("TBI"). He further stated that he was diagnosed with PTSD around the time of

10

his discharge and sought treatment once he was back in Georgia. Appellant also outlined his PTSD symptoms, including nightmares, anxiety, and sudden anger, as well as the treatment he received, including medication and counseling. His testimony regarding the shooting differed slightly from his custodial statement made to law enforcement officers after the shooting. Most notably, Appellant testified that, prior to retrieving his gun, Wilson physically threatened to "whip [Appellant's] a\*\*," taunted him, and started stretching "[l]ike he was fixing to come running at [Appellant]." After retrieving his gun, Appellant went outside, Wilson started coming at Appellant across the yard with his "chest bowed out," and Scooter was jumping and barking at Appellant. Appellant then fired multiple shots at Wilson. Appellant testified that he was terrified of Wilson because Wilson was physically bigger than Appellant and Appellant was suffering from a broken collarbone at the time.

In rebuttal, the State called Dr. Jeremy Gay, one of the psychologists who evaluated Appellant prior to trial. During direct examination, the prosecutor questioned Dr. Gay generally about

PTSD and then inquired whether Appellant appeared to be symptomatic on the night of the shooting, to which Dr. Gay responded in the negative. The prosecutor then walked Dr. Gay through the events of the night and inquired whether Appellant's actions were consistent with someone suffering from PTSD. Dr. Gay responded that they were not. During cross-examination, Appellant's counsel elicited the following testimony from Dr. Gay: (1) that he only met with Appellant once for two hours; (2) that Appellant had been diagnosed with a TBI; (3) that TBI symptoms can include mood changes, personality changes, and concentration issues, and that these symptoms can be short-term or permanent; (4) that chronic PTSD is PTSD that persists six months to a year after the traumatic event and therefore becomes a chronic condition; (5) that Appellant "probably met [the] criteria for a diagnosis of PTSD and major depressive disorder"; (6) that symptoms of PTSD can include anxiety, irritability, agitation, intrusive thoughts, anger in the form of hyperarousal, hypervigilance, difficulty getting along with people, and distrust of people, like neighbors, and that PTSD

12

can cause someone to be wary and continually check their surroundings; (7) that he had worked with combat veterans previously, and that presentation of symptoms related to experienced trauma is unique to each individual; and (8) that persons suffering from PTSD may present differing symptoms.

2. On appeal, Appellant raises four enumerations of error alleging constitutionally ineffective assistance of counsel. To prevail on these claims, Appellant must demonstrate that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. See *Sullivan v. State*, 308 Ga. 508, 510 (2) (842 SE2d 5) (2020) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficient performance, Appellant must show that trial counsel performed their duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. Establishing deficient performance

> is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [Appellant] bears the burden of overcoming this

13

presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Vann v. State*, 311 Ga. 301, 303 (2) (857 SE2d 677) (2021) (citations and punctuation omitted). To establish prejudice, Appellant must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different. See *Sullivan*, 308 Ga. at 510 (2). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). And, "'[t]his burden is a heavy one.'" *Keller v. State*, 308 Ga. 492, 496 (2) (842 SE2d 22) (2020) (quoting *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019)). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Sullivan,* 308 Ga. at 510 (2) (citation and punctuation omitted).

(a) Appellant first contends that his trial counsel rendered

14

constitutionally ineffective assistance by relying on Appellant's PTSD diagnosis to argue defenses that are prohibited by law, i.e., to negate intent for malice murder, to mitigate intent for voluntary manslaughter, and to support self-defense.[6] Appellant, citing *Benham v. State*, 277 Ga. 516 (591 SE2d 824) (2004), argues that trial counsel is constitutionally deficient when counsel argues a theory that is not recognized as a lawful defense. In *Benham*, trial counsel proffered a justification defense based on OCGA § 16-3-21 (use of force in defense of self or others), instead of defense of habitation under OCGA § 16-3-23 (1). See *Benham*, 277 Ga. at 517. There, we determined that trial counsel "failed to appreciate that the defense of habitation may have justified the use of deadly force in this case" and "[i]n failing to adequately research and understand the defenses available to her client, defense counsel rendered

---

[6] See *Collins*, 306 Ga. at 467 (2) (holding that evidence of a defendant's subjective mental condition or mental illness, like PTSD, is not relevant to a claim of voluntary manslaughter); *Virger*, 305 Ga. at 302-303 (9) (c) (concluding that this Court has consistently upheld the exclusion of evidence of a defendant's diminished mental condition, like PTSD, when offered to support other defenses, like self-defense, or to negate the intent element of a crime) (citing *Thompson v. State*, 295 Ga. 96, 99 (2), n.2 (757 SE2d 846) (2014)).

15

assistance that fell below the minimum standard set forth in *Strickland.*" *Benham*, 277 Ga. at 517-518.

However, contrary to Appellant's argument, this is not a case where trial counsel failed to adequately research and understand the defenses available to their client. Here, trial counsel explicitly acknowledged in the pre-trial stipulation that evidence of PTSD was inadmissible to negate intent, but argued that evidence of PTSD was admissible to explain Appellant's conduct. The State agreed this was a permissible purpose. At the motion for new trial hearing, Sliz, one of Appellant's trial attorneys, did acknowledge introducing "as much [mental health evidence] as we could get in not calling it PTSD . . . hoping to seek from the jury some – some – not nullification, but reduction of punishment." But we cannot say that trial counsel's strategy was objectively unreasonable given that trial counsel sought and received jury instructions on voluntary manslaughter and self-defense. Further, "it cannot be said that no competent attorney[s] in trial counsel's position would not have employed the same strategy in this case." *Finnissee v. State*, 309 Ga. 557, 561 (2)

16

(847 SE2d 184) (2020). We conclude Appellant has failed to show deficient performance under *Strickland*, and therefore, this ineffective assistance claim fails.

(b) Appellant next contends that his trial counsel rendered constitutionally ineffective assistance by failing to file a pre-trial notice under Uniform Superior Court Rule 31.5, which he says prevented him from introducing evidence of mental illness. This contention fails.

Rule 31.5 requires written, pre-trial notice to the State where an accused intends to "raise the issue that [he] was insane, mentally ill, or intellectually disabled at the time of the act or acts charged against the accused[.]" Appellant contends that a Rule 31.5 notice should have been filed in this case to "facilitate the presentation of needed evidence of Appellant's mental illness at the time of the shooting."

There is no dispute that Appellant actually presented evidence of his mental illness (i.e., PTSD) and treatment; a recounting of the extensive evidence can be found in Division 1 above. In addition, at

the motion for new trial hearing, Greenwald, one of Appellant's trial attorneys, testified that he did not file a Rule 31.5 notice because there was no evidence of insanity. In fact, three doctors found Appellant was not insane at the time of the shooting. Appellant's citation of *McKelvin v. State*, 305 Ga. 39, 41 (2) (a) (823 SE2d 729) (2019), for the argument that a Rule 31.5 notice is required under circumstances such as his is unavailing. In *McKelvin*, we specifically held that the defense of involuntary intoxication is a *subset* of an insanity defense and thus encompassed by Rule 31.5. 305 Ga. at 41 (2) (a). By contrast, Appellant cites no authority for the proposition that PTSD is a subset of insanity.

We therefore conclude that trial counsel's decision to forgo a Rule 31.5 notice was not objectively unreasonable. See *Martinez v. State*, 284 Ga. 138, 142 (4) (663 SE2d 675) (2008) ("[T]he evidence fails to demonstrate that trial counsel's decision to forego an insanity or delusional compulsion defense based upon PTSD was unreasonable."). And, the fact that appellate counsel would have pursued a different strategy does not render trial counsel's strategy

18

unreasonable. See id. We conclude Appellant has failed to show deficient performance under *Strickland*, and therefore, this ineffective assistance claim fails.

(c) Appellant next contends that his trial counsel rendered constitutionally ineffective assistance by failing to properly subpoena Dr. Dzagnidze.

The record reflects that trial counsel properly subpoenaed Dr. Dzagnidze under Georgia law, but failed to properly subpoena Dr. Dzagnidze, a VA employee, in compliance with federal *Touhy* regulations[7] contained in 38 CFR § 14.800 et seq. These regulations govern

> [t]he production or disclosure of . . . records of the [VA]; and . . . [t]he testimony of present or former VA personnel relating to any official information acquired by any individual as part of that individual's performance of official duties . . . in federal, state or other legal proceedings covered by these regulations.

38 CFR § 14.800. Assuming without deciding that trial counsel's failure to properly subpoena Dr. Dzagnidze under 38 CFR § 14.800

---

[7] See *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (71 SCt 416, 95 LE 417) (1951).

19

et seq. was deficient, we turn to whether Appellant has demonstrated prejudice.

Appellant contends that if properly subpoenaed, Dr. Dzagnidze would have testified that Appellant had been advised to call 911 if he experienced any homicidal ideations, which would then allow counsel to argue that people suffering from PTSD may have homicidal ideations. On the second day of trial, Greenwald stated he was unsure of Dr. Dzagnidze's availability to testify given the VA's general reluctance to allow her to testify under the *Touhy* regulations. Specifically, Greenwald stated the VA would not allow Dr. Dzagnidze to be qualified as an expert witness, would not allow her to explain PTSD, would not allow her to offer any opinion, and that she would only be able to testify verbatim as to what was contained within Appellant's VA medical records. The next morning, Greenwald confirmed the VA would not permit Dr. Dzagnidze to testify. However, trial counsel and the State had agreed that trial counsel could read stipulated portions of the VA medical records to the jury. On this issue, Greenwald stated at trial, "The records speak

20

for themselves since Dr. Dzagnidze would not be allowed to opine as a federal employee what they mean."

At the motion for new trial hearing, appellate counsel presented an affidavit from Dr. Dzagnidze. In the affidavit, Dr. Dzagnidze averred that she was subpoenaed to Appellant's trial but was not authorized to provide expert testimony pursuant to the *Touhy* regulations contained in 38 CFR §§ 14.806 and 14.808.[8] She further averred that she was involved in Appellant's treatment from September 2011 through June 2017 and relayed some of her progress notes contained within Appellant's VA medical records.

Dr. Dzagnidze's affidavit does not contain a reference to homicidal ideations, and therefore, does not support the argument that the failure to properly subpoena Dr. Dzagnidze prevented her from explaining the connection between Appellant's psychological conditions and any homicidal ideations. Notably, Appellant's VA

---

[8] 38 CFR § 14.808 (a) provides, in part: "VA personnel shall not provide, with or without compensation, opinion or expert testimony in any legal proceedings concerning official VA information, subjects or activities, except on behalf of the United States or a party represented by the United States Department of Justice."

medical records indicate that he consistently denied homicidal ideations.[9] Further, Appellant has not demonstrated that Dr. Dzagnidze would have been able to even offer such an opinion given the relevant *Touhy* regulations.  Thus, Appellant has not shown there is a reasonable probability that the result of the trial would have been different. See *Arnold v. State*, 292 Ga. 268, 272 (2) (b) (737 SE2d 98) (2013) (no prejudice where the defendant did not show what the result of any additional mental health examination would have been, and thus failed to establish prejudice by showing that the result of his trial would have been different if such a psychological examination was pursued). We therefore conclude that Appellant has failed to show prejudice under *Strickland*, and this ineffective assistance claim fails.

(d) Appellant next contends that his trial counsel rendered constitutionally ineffective assistance by failing to object to and rebut the testimony of Dr. Gay. Under this enumeration of error,

---

[9] Greenwald testified at the motion for new trial hearing that he decided not to read these denials to the jury because he concluded the jury should not hear the phrase "homicidal ideations" during a murder trial.

22

Appellant contends that trial counsel performed deficiently by: (1) failing to object to Dr. Gay's testimony concerning Appellant's mental state at the time of the shooting; (2) failing to rebut Dr. Gay's testimony by calling another psychologist; and (3) failing to object when Dr. Gay testified as to the ultimate issue of intent.

Regarding the failure to object to and rebut Dr. Gay's testimony, some background is necessary. At trial, the defense had Dr. Todd Antin[10] under subpoena. Greenwald testified at the motion for new trial that he decided not to call Dr. Antin during the defense's presentation of evidence because Greenwald believed Dr. Antin's testimony would be harmful to Appellant. Appellant had told Dr. Antin that he shot Wilson "dead in the heart," that he felt "blind rage," and that "if he had attempted to shoot [Wilson] anywhere else [Wilson] would have continued to harass him." Greenwald testified at the motion for new trial hearing that these statements of Appellant sounded like premeditation as opposed to reacting to a

---

[10] Dr. Antin was the psychiatrist who evaluated Appellant prior to trial and determined he was not insane at the time of the shooting, and presently that he was mentally competent to stand trial.

combat-type situation, and therefore, the disadvantages of calling Dr. Antin outweighed any potential benefits. However, without Dr. Antin, Appellant had no expert witness to explain PTSD and how it affected Appellant's conduct. Greenwald therefore did not object to Dr. Gay, as a matter of trial strategy, because he was able to cross-examine him on the characteristics and symptoms of PTSD. Greenwald testified this calculation – i.e., the risk of calling Dr. Antin outweighing any potential benefit – did not change after Dr. Gay testified because trial counsel was able to elicit helpful testimony from Dr. Gay about PTSD, TBI, and major depressive disorder. Further, trial counsel had already introduced evidence of Appellant's PTSD diagnosis and treatment through the introduction of his VA medical records.

We conclude that, under the circumstances, trial counsel's strategy to use Dr. Gay to explain PTSD and how it affected Appellant's conduct was reasonable. See *Brown v. State*, 292 Ga. 454, 457 (2) (738 SE2d 591) (2013) (counsel's strategic decision not to continue searching for a defense expert, but instead to challenge

the State's experts on cross-examination, while also presenting a robust defense to other aspects of the State's case, was not unreasonable and did not constitute deficient performance). And, "[r]easonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for reversal." *Eller v. State*, 303 Ga. 373, 383-384 (IV) (D) (811 SE2d 299) (2018) (citation and punctuation omitted), overruled in part on other grounds, *Lester v. State*, 310 Ga. 81, 93 (3) (b) (849 SE2d 425) (2020). We conclude that Appellant has failed to show deficient performance under *Strickland* by failing to object to Dr. Gay, and therefore, this ineffective assistance claim fails.

As to Appellant's claim regarding the failure to rebut Dr. Gay's testimony by calling another psychologist,

> the decision whether to present an expert witness, like other decisions about which defense witnesses to call, is a matter of trial strategy that, if reasonable, will not sustain a claim of ineffective assistance. Indeed, for a defendant to establish that a strategic decision constitutes deficient performance, a defendant must show that no competent attorney, under similar circumstances, would have made it. Moreover, a fair assessment of attorney performance requires that every effort be made

25

to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Sullivan*, 308 Ga. at 512-513 (2) (b) (citations and punctuation omitted).

At the motion for new trial hearing, Greenwald did not explain the potential benefits of calling Dr. Antin, beyond saying that "each one of [the three] doctors had some things to say good about the situation that we thought we could use." We conclude that trial counsel's decision not to call Dr. Antin in rebuttal to Dr. Gay because the disadvantages of Dr. Antin's testimony outweighed any potential benefits was not unreasonable. We therefore conclude that Appellant failed to show deficient performance under *Strickland*, and this ineffective assistance claim also fails.

Finally, Appellant argues trial counsel was ineffective when he failed to object when Dr. Gay testified as to the ultimate issue of intent in violation of OCGA § 24-7-704 (b), which states:

No expert witness testifying with respect to the mental state or condition of an accused in a criminal

26

proceeding shall state an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

At trial, the following colloquy occurred between the prosecutor and Dr. Gay:

> PROSECUTOR: He told law enforcement that he did what he told the victim he was going to do when he said: I done what I told him. Would that be consistent or inconsistent with someone experiencing PTSD symptoms?
> DR. GAY: I would say that would be inconsistent. And that kind of goes back to premeditation and intent.

Assuming without deciding that Dr. Gay testified on the ultimate issue of intent in violation of OCGA § 24-7-704 (b) and that trial counsel was constitutionally deficient for failing to object to this portion of Dr. Gay's testimony, Appellant has failed to carry his burden to show prejudice. Given the overwhelming evidence of Appellant's guilt, he has not shown a reasonable probability that the result of the trial would have been different if Dr. Gay had not made the "goes back to premeditation and intent" comment. See *Bridges*

*v. State*, 286 Ga. 535, 540 (5) (690 SE2d 136) (2010) (trial counsel's failure to object to ultimate issue testimony not prejudicial given the overwhelming evidence against the appellant). We therefore conclude that Appellant failed to show prejudice under *Strickland*, and thus, this ineffective assistance claim fails.

3. Finally, we consider whether the cumulative effect of trial counsel's errors entitles Appellant to a new trial. See *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007) ("[I]t is the prejudice arising from counsel's errors that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum.") (citation and punctuation omitted), overruled on other grounds, *State v. Lane*, 308 Ga. 10, 23 (4) (838 SE2d 808) (2020). Here, the cumulative prejudice from any assumed deficiencies discussed in Division 2 (b) and (d) – the failure to properly subpoena Dr. Dzagnidze, and the failure to object to a portion of Dr. Gay's testimony – is insufficient to show a reasonable probability that the results of the proceeding would have been different in the absence of the alleged deficiencies.

*Judgment affirmed. All the Justices concur.*

Decided January 4, 2022.

Murder. Barrow Superior Court. Before Judge Primm.

*Clark & Towne, Jessica R. Towne*, for appellant.

*J. Bradley Smith, District Attorney, Patricia J. Brooks, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.