NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 28, 2025

S24A1313. REDDICK v. THE STATE.

ELLINGTON, Justice.

A Grady County jury found Pascal Lorenzo Reddick guilty of felony murder and possession of a firearm during the commission of a felony in connection with the shooting death of Antavius Robinson.[1] Reddick contends that the evidence is insufficient to

---

[1] A Grady County grand jury returned an indictment on December 9, 2021, charging Reddick with having committed, on November 14, 2020, malice murder, felony murder, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. During a jury trial that began on June 13, 2022, the jury found Reddick guilty of felony murder, aggravated assault, and possession of a firearm during the commission of a felony. The jury found Reddick not guilty of malice murder, and the State entered an order of nolle prosequi on the count of possession of a firearm by a convicted felon. The trial court initially sentenced Reddick on June 15, 2022, but later entered a revised final disposition on July 7, 2022, to correct an error. The trial court sentenced Reddick to life in prison for felony murder and to a consecutive five-year prison sentence for possession of a firearm during the commission of a felony. The court merged the aggravated assault count into the felony murder conviction at sentencing. On July 26, 2022, Reddick timely filed a motion for a new trial. New counsel entered an appearance on Reddick's behalf on November 28, 2022, and, thereafter, twice amended Reddick's motion for a new trial. After a hearing held on August 10, 2023, the trial court denied the motion for a new trial on March 11, 2024.

support his convictions because the State did not prove beyond a reasonable doubt that Reddick was unjustified in using deadly force in self-defense or in defense of habitation, that the trial court abused its discretion in denying his immunity motion, and that trial counsel provided ineffective assistance. As explained below, Reddick's arguments lack merit; therefore, we affirm his convictions.

1. Reddick contends that the evidence was insufficient to support his conviction for felony murder, arguing that the State failed to prove beyond a reasonable doubt that he was not justified in using deadly force against the victim. For the reasons that follow, we disagree.

When considering the sufficiency of the evidence, this Court views the evidence "in the light most favorable to the verdict and evaluate[s] whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Davenport v. State*, 309 Ga. 385, 388 (1) (846

Reddick timely filed a notice of appeal on March 27, 2024. Reddick's appeal was docketed to the August 2024 term, and the case was thereafter submitted for a decision on the briefs.

SE2d 83) (2020) (citing *Jackson v. Virginia*, 443 U. S. 307, 319 (III)

(B) (99 SCt 2781, 61 LE2d 560) (1979)). At trial, Reddick contended

that he acted to defend himself and his home, and the trial court

instructed the jury to consider self-defense and defense of habitation

as affirmative defenses. Under Georgia law,

> a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

OCGA § 16-3-21 (a). Defense of habitation is governed by OCGA §

16-3-23, which sets forth when a person is authorized to use force in

the defense of habitation and also sets forth three specific contexts

in which deadly force is authorized.[2] See *Clark v. State*, 307 Ga. 537,

---

[2] OCGA § 16-3-23 provides:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering

3

540 (837 SE2d 265) (2019). "[Deadly force] is not justified if the degree of force used by the defendant exceeds that which a reasonable person would believe necessary to defend against the victim's unlawful actions." *Harris v. State*, 274 Ga. 422, 423 (1) (554 SE2d 458) (2001). See also *Clark v. State*, 271 Ga. at 29 (2) ("The use of excessive force or unlawful force while acting in self-defense is not justifiable."). "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Birdow v. State*, 305 Ga. 48, 50 (1) (823 SE2d 736) (2019).

Viewed in the light most favorable to the jury's verdicts, the evidence shows the following. During the early morning hours of

---

personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;

(2) That force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred; or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

4

November 14, 2020, Lakeisha Robinson ("Lakeisha"), the victim's wife, went to Reddick's Grady County home. Reddick and Lakeisha had sex on an air mattress on the living room floor. Robinson repeatedly called his wife, but she did not answer the phone.

Robinson drove to Reddick's home in search of his wife. When he arrived, he used his cell phone's camera to record his actions. The video recording showed Robinson exit his car, approach his wife's car (which was parked in Reddick's driveway), and look inside it. He lowered his phone to his side and walked to Reddick's home, a mobile home with metal walls and a small porch off the front door. As he walked up the short flight of steps to the front door, the sound of a woman moaning can be heard on the recording. At that point, Robinson yells: "Hey, b***h, get out of there! Mother f****r! I'mma kill your motherf***ing ass, ho! Get your ass out of th—." Robinson abruptly stopped speaking at the sound of a gunshot, and the video recording ends.

A silent, video-only recording from Reddick's neighbor's security camera also shows Robinson walking up to Reddick's mobile

home. In the video, Robinson leaves the frame for about 20 seconds and then can be seen quickly retreating toward his car. Moments later, he collapses to the ground near his car.

After the shooting, Reddick placed a call to his cousin, Lieutenant Nixon of the Grady County Sheriff's Office. When Lieutenant Nixon did not answer, Reddick sent him a text message stating: "Cuz answer man I shot at a n***a thru my door[.] I'm in Cairo." When Lieutenant Nixon called Reddick, Reddick told him that he shot a person trying to break into his house. At the request of a GBI agent, Lieutenant Nixon picked Reddick up and drove him to speak with the agent.

GBI Special Agent Charlie Johnston investigated the shooting. When he arrived at Reddick's home, he found Robinson's body lying face-up about 50 feet from Reddick's front porch. Agent Johnston learned that Lakeisha had turned Robinson onto his back and attempted to perform life-saving measures. Given that Robinson's body was found about 50 feet from Reddick's porch, Agent Johnston testified that Robinson had moved away from Reddick's porch when

6

he was shot. Outside, on Reddick's front porch, Agent Johnston recovered a 9mm shell casing. The shell casing was wedged between the porch flooring and the exterior siding of Reddick's mobile home. A second 9mm shell casing was recovered from inside the home on the living room floor. Agent Johnston also discovered a single hole in the wall of the mobile home near the front door that appeared to be from a bullet being fired from inside the home. He also noted some minor damage to the exterior of the front door but could not tell how old the damage was.

No blood was found on Reddick's porch, nor was there a trail of blood leading to the body. Based on his training and experience, Agent Johnston opined that the first shot was fired inside the home in reaction to the victim striking the front door, and the second shot happened after Reddick opened the door and fired the gun outside, as there was no way for the second shell casing to have landed where it did if Reddick had fired from inside his home with the door closed.

GBI Special Agent Montana Walker separately interviewed

Lakeisha and Reddick.[3] Reddick waived his *Miranda* rights. During the course of those interviews and based on evidence recovered from the crime scene, the agent concluded that Robinson went to Reddick's home to find his wife. Once there, he heard Reddick and his wife having sex. He banged on the door, demanding that his wife come outside. After the first gunshot through the trailer wall, Robinson ran from the porch toward his car. As Robinson fled, Reddick shot at him a second time through the open door, and that shot hit Robinson.

During his interview with Agent Walker, Reddick said that he fired his gun twice from inside his home. When Agent Walker confronted Reddick with the evidence of the shell casing discovered wedged between his front porch and the side of his mobile home, he conceded that he may have fired a second time "during the heat of

---

[3] Trial counsel was unable to locate Lakeisha and to subpoena her for trial. Lakeisha's statement to the GBI was not tendered into evidence. Although Lakeisha testified at Reddick's pretrial immunity hearing, defense counsel did not offer the transcript of her hearing testimony in evidence at trial. We also note that Reddick does not argue on appeal that any part of Agent Walker's testimony constituted inadmissible hearsay.

8

the moment" while outside on the porch. Reddick said he thought that someone was trying to break into his home. However, he claimed that, when he opened his door, he did not see anyone. He told Agent Walker that he was "scared sh\*\*less," and was not trying to kill anyone.

During his trial testimony, Reddick claimed that, while he was having sex with Lakeisha, he heard a loud "thump" or "boom" at his front door. He testified that he heard Robinson yelling "I'm going to kill you," as he banged on the front door. Reddick also said he heard a noise that sounded like someone trying to pry open his door. He said that he was scared and did not know how many people were on the other side of the door. He testified that he got out of bed, grabbed his gun off a nearby table, and "shot twice[.]" He said he shot "at a downward angle" through his home toward the front porch. He said he had no intention of killing anyone and intended only to scare the person away. He testified that, after he fired the gun, he heard Robinson say, "Oh, s\*\*t," and then he heard Lakeisha say that the voice was her husband's.

Reddick also testified that, although he was still afraid, he walked to the door and stuck his head out just enough to yell for Robinson to get out of his yard. He claimed that he did not step out onto the porch at all or leave through the front door of his home. Instead, he went out his back door toward his neighbor's house, at which point he looked back and saw a car with the lights on and the driver's door open. He claimed that he did not know what happened to Robinson. Reddick testified that he called a friend of his and told him that someone was beating on his door and trying to break into his house, and that he shot through his door and did not know if the person was dead or had fled. He also testified that he tried to call his cousin, Lieutenant Nixon. Reddick did not, however, call 911 to report the shooting.

In late November or early December 2020, a friend of Reddick's went to the Thomas County Sheriff's Office and turned in Reddick's 9mm pistol. The Sheriff's Office sent the pistol to the GBI, and subsequent ballistics testing showed that the two 9mm shell casings recovered from the crime scene were fired from Reddick's 9mm

pistol.

A GBI forensic pathologist autopsied Robinson's body. The pathologist determined that the body had an entrance wound to the front, upper-left chest near the armpit. The corresponding exit wound was in the mid- to lower-right side of the back and was four inches lower than the entrance wound. The bullet damaged Robinson's lungs and heart, causing massive internal bleeding which resulted in his death. The pathologist determined that, if Robinson had been standing facing the front door when he was shot, the bullet would have gone through his chest and exited straight through his upper back and not at the left to right and downward angle he observed. The pathologist opined that Robinson's height was not a factor that would have influenced the bullet's trajectory through his body.

GBI Special Agent Amy Braswell conducted a trajectory analysis of the bullet hole in the wall of Reddick's mobile home. She used the autopsy report to aid her in formulating an opinion regarding the trajectory of the bullet. She opined that, based on the

trajectory of the bullet, the victim was not standing on the porch when he was shot. Based on her review of all the evidence and given the four-inch downward angle between the victim's entrance and exit wounds, it was more consistent with the shooter being on the porch and shooting down at Robinson while he was standing on the ground. Agent Braswell further opined that the one-inch difference in height between the porch and Reddick's front door would not account for the bullet's four-inch downward trajectory through the victim's chest.

When viewed in the light most favorable to the verdicts, the evidence was sufficient as a matter of constitutional due process for a reasonable jury to infer that, while the victim did approach Reddick's home, beat on the door, and yell at his wife, he did not intend to enter Reddick's home; rather, he wanted his wife to come outside. Further, mere "[v]erbal threats and fisticuffs do not justify the use of deadly force." *Collier v. State*, 288 Ga. 756, 757 (2) (707 SE2d 102) (2011). The evidence showed that Robinson died from a bullet that caused massive injury to his heart and lungs, yet he was

12

able to exclaim "Oh, s**t" after the first shot. Moreover, no blood was found on the porch or on the ground leading to Robinson's body. From this evidence, the jury could infer that the first shot Reddick fired from inside his home missed Robinson. The jury could also infer that, after Reddick fired the first shot, Robinson stopped beating on the door and making threats and moved off the porch and away from Reddick's home. The ballistic and trajectory evidence supported the State's theory of the case that Reddick went out onto his porch and shot at Robinson, who had turned slightly to glance behind him as he retreated to his car. Robinson's body was found in front of the parked cars about 50 feet away from the front porch. The evidence also showed that Robinson was unarmed.

Based on this evidence, the jury was authorized to find that Reddick fired the fatal shot when Robinson was unarmed and far enough away that he posed no threat to Reddick or Reddick's home. The State's evidence was sufficient for the jury to conclude that, at the time of the shooting, Reddick did not reasonably believe it was necessary to shoot the victim to defend himself or his home. See, e.g.,

*Corley v. State*, 308 Ga. 321, 322 (1)(a) (840 SE2d 391) (2020) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense." (citation and punctuation omitted)); *Clark v. State*, 307 Ga. 537, 541 (1) (837 SE2d 265) (2019) (To support a theory of defense of habitation, "the evidence must establish that the defendant had an objective reasonable belief that the assailant is entering to assault, to offer personal violence, or to commit a felony and that deadly force is necessary to prevent one of those acts[.]" (citation, punctuation, and emphasis omitted)); *Collier*, 288 Ga. at 757 (2) ("Justification cannot be based on a deadly assault which has been completely ended, unless the assailant has some further apparent ability to continue it[.]") (citation and punctuation omitted)). Instead, the jury could infer that Reddick fired a deadly weapon at Robinson as he was retreating from the mobile home, killing Robinson during the course of an aggravated assault on Robinson, which constitutes felony murder. OCGA § 16-5-1 (c) ("A person commits the offense of murder when, in the commission of a felony, he or she causes the

14

death of another human being irrespective of malice.").

We conclude, therefore, that the evidence presented at trial was sufficient as a matter of constitutional due process to disprove Reddick's justification defenses beyond a reasonable doubt and to authorize a rational jury to find him guilty beyond a reasonable doubt of the crimes of felony murder and possession of a firearm during the commission of that felony. See *Jackson v. Virginia*, 443 U.S. at 319 (III); *Corley*, 308 Ga. at 322 (1) (a); *Clark*, 307 Ga. at 541 (1); *Collier*, 288 Ga. at 757 (2).

2. Reddick contends that the trial court abused its discretion in denying his pretrial motion seeking immunity from prosecution pursuant to OCGA § 16-3-24.2.[4] He contends that the trial court failed to consider and rule on his claim that he was acting in defense of habitation. The record does not support this claim of error.

---

[4] OCGA § 16-3-24.2 provides:
A person who uses threats or force in accordance with Code Section 16-3-20, 16-3-21, 16-3-23, 16-3-23.1, 16-3-24, or 17-4-20 shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title.

Code Section 16-3-24.2 bars criminal proceedings against a defendant if the defendant presents sufficient evidence at a pretrial hearing to persuade the trial court by a preponderance of the evidence that the defendant was justified in using deadly force. See *Ellison v. State*, 313 Ga. 107, 110 (868 SE2d 189) (2022) ("To prevail on a motion for immunity under OCGA § 16-3-24.2, a defendant must establish his justification defense by a preponderance of the evidence."). "In reviewing the denial of a motion for pretrial immunity, we must view the evidence in the light most favorable to the trial court's ruling and accept the trial court's findings of fact and credibility determinations if there is any evidence to support them." Id. (citation and punctuation omitted).

In this case, although the trial court found that Reddick's "fatal actions were motivated by other motives rather than self-defense" and that he "could not reasonably believe under the presented evidence that there was a danger of imminent death or great bodily injury to himself[,]" the trial court made no *express* finding addressing Reddick's defense of habitation claim, which he

16

raised both in his initial immunity motion, and his post-hearing brief in support of the immunity motion. However, we conclude that such a ruling is *implicit* in the trial court's ruling and final order for the following reasons.

In both its order denying Reddick's pretrial motion for immunity as well as its order denying Reddick's motion for a new trial on the immunity claim, the trial court referenced both the law of self-defense as well as defense of habitation. After considering all of the evidence submitted during the pretrial hearing, the trial court found:

> From the credible evidence presented to this Court, it appeared that after the shot through the doorway, the decedent fled the porch area and was moving towards the area of the decedent's vehicle, some approximately fifteen feet away; however, the Defendant stood in the trailer doorway or on the porch area and shot directly at the decedent, who was in the yard area at the time of the second shot. No evidence was presented that the decedent was armed with any type of weapon at any point.

Thus, the evidence presented at the immunity hearing supported the trial court's ruling that, at the time Reddick shot the victim, the victim was not attempting to enter Reddick's home. Rather he was

17

unarmed and retreating toward his car. Given these findings, the trial court implicitly rejected Reddick's defense-of-habitation claim when it concluded: "The presented evidence at the two immunity motion hearings [is] insufficient for this Court to determine that [Reddick] met [his] burden of proving that [he] is entitled to immunity from prosecution pursuant to OCGA § 16-3-24.2," a statute that expressly includes defense of habitation pursuant to OCGA § 16-3-23 as a rationale for immunity from prosecution.[5] Consequently, Reddick has not shown that the trial court's ruling was an abuse of discretion.

3. Reddick contends that the trial court erred in denying his motion for a new trial on ineffective assistance of counsel grounds. He argues that his trial counsel rendered ineffective assistance in three respects: (1) he failed to tender into evidence Lekiesha Robinson's testimony from the immunity hearing; (2) he failed to adequately challenge the qualifications and testimony of Agent Braswell, and (3) he failed to object to the allegedly unfairly

---

[5] See footnote 3, supra.

prejudicial testimony of Agent Walker. For the reasons set forth below, we discern no error in the trial court's ruling that Reddick failed to carry his burden of showing that trial counsel was ineffective.

To prevail on his claims of ineffective assistance of counsel, Reddick must demonstrate both that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. See *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficient performance, Reddick must show that trial counsel performed her duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. Establishing deficient performance

> is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [the appellant] bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy

may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Park v. State*, 314 Ga. 733, 740-741 (2) (879 SE2d 400) (2022) (citation and punctuation omitted). To establish prejudice, Reddick "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." *Bates*, 313 Ga. at 62 (2). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). "And, this burden is a heavy one." Id. at 62-63 (2) (citation and punctuation omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Taylor v. State*, 315 Ga. 630, 647 (5) (b) (884 SE2d 346) (2023) (citation and punctuation omitted).

(a) *Lakeisha Robinson's testimony*. Reddick contends that his trial counsel was ineffective for failing to seek to admit Lakeisha's immunity hearing testimony at trial under an exception to the hearsay rule. Had counsel done so, he argues, the testimony would

20

have been admitted, and it would have corroborated Reddick's testimony at trial that Robinson violently attempted to enter his home while threatening to kill those inside. For the reasons that follow, Reddick has not carried his burden of showing that trial counsel's actions, even if deficient, were prejudicial.

The record shows that, although Lakeisha testified at the immunity hearing, she was unavailable at trial, despite counsel's repeated attempts to find her and subpoena her. At the hearing on Reddick's motion for a new trial, defense counsel testified that she thought Lakeisha's testimony at the immunity hearing was favorable to Reddick's justification defense. Nevertheless, counsel did not seek to admit Lakeisha's immunity hearing testimony at trial under an exception to the hearsay rule.

Although Lekeisha's hearing testimony would have corroborated Reddick's trial testimony that Robinson banged on the door and shouted threats, ample other evidence already existed to show this, including Robinson's own cell phone recording. Thus, her testimony, while arguably helpful on this point, was not required.

More significantly, however, had counsel persuaded the trial court to admit Lakeisha's testimony from the motion hearing, that testimony, on the whole, would not have been favorable to Reddick and, in fact, would have undermined his claim of self-defense because it contradicted Reddick's trial testimony that he fired both shots from inside his home while the door was closed.

During the immunity hearing, Lakeisha testified that, as she and Reddick were having sex, she heard loud banging on the door of the mobile home as well as her husband's angry threats and demands that she come outside. Moments later, she heard what she believed was the sound of a gunshot. Because it was dark in the room, she did not see Reddick grab or fire his gun. But she saw Reddick open his front door, and then she heard another gunshot. She did not see Reddick actually fire his pistol because she ran out of the living room and toward the back of the home. Once outside, she found her husband's body where their cars were parked. As Reddick fled, she called 911. She saw no weapons around her husband's body, and, when she returned home, she found her

husband's shotguns locked away.

Lakeisha's testimony not only contradicts Reddick's testimony that he fired his weapon twice from inside the home while the door was closed, but it also corroborates the State's opinion and forensic evidence that Reddick fired the second shot at Robinson, who was unarmed, through the open door as Robinson retreated. Thus, assuming without deciding that trial counsel's performance was professionally deficient for failing to seek to introduce Lakeisha's immunity hearing testimony at trial, trial counsel's allegedly deficient performance nevertheless cannot be deemed prejudicial because Reddick has not shown that Lakeisha's testimony would have been sufficient to undermine confidence in the outcome of the trial. See *Hill v. State*, 291 Ga. 160, 164 (4) (728 SE2d 225) (2012) (Defendant did not receive ineffective assistance of trial counsel, despite any deficient performance in counsel's lack of diligence in obtaining a particular witness's testimony at trial, as the outcome of the trial would not have been different if the witness's pretrial testimony had been admitted.).

(b) *Agent Braswell's qualifications and testimony*. Reddick contends that his trial counsel was ineffective because she failed to object to the qualifications of Agent Braswell as an expert in bullet-trajectory analysis and failed to adequately cross-examine Agent Braswell's opinions and the basis for them. Reddick also contends that Agent Braswell's opinion was conclusory and unsupported by any data or measurements. For the reasons set forth below, we conclude that Reddick has failed to establish that his counsel's performance was deficient with regard to Agent Braswell's testimony.

The record shows that Agent Braswell was deemed an expert in crime scene investigation by the trial court during the immunity motion hearing. The State laid a foundation for the agent's testimony in the field of bullet-trajectory analysis, and defense counsel cross-examined the agents' qualifications. The record shows that Agent Braswell has a master's degree in criminal justice as well as general training in forensic science through the police academy, the GBI, and the National Forensic Academy. She completed a

24

bullet-trajectory analysis course through the National Forensic Academy and thereafter engaged in yearly continuing education and advanced training on the subject. Also, during her 22 years as an agent with the GBI, she performed over 50 trajectory analyses and testified numerous times as an expert in the subject. After cross-examining the agent on her qualifications, defense counsel objected to the agent being tendered as an expert in bullet-trajectory analysis on the ground that she was biased in favor of the prosecution, but the trial court overruled that objection. At trial, the prosecutor also laid the foundation for Agent Braswell's admission as an expert witness, defense counsel cross-examined the agent's qualifications, and the trial court admitted the agent as an expert in bullet-trajectory analysis – this time without objection.

The record shows that counsel thoroughly cross-examined Agent Braswell's qualifications and the facts and assumptions upon which the agent based her opinions. Counsel asked the agent why she took no measurements relating to the bullet's trajectory from the bullet hole near Reddick's front door through Robinson's body,

25

arguing that her testimony failed to acknowledge that the height and directionality of the bullet hole on the exterior of the mobile home was the same height and directionality as the entry wound in Robinson's body. But as the agent had explained, "[y]ou have to have two fixed points to do trajectory" analysis, and in this case, she could not perform that particular analysis "because the body [was] gone." Instead, the agent based her opinion on the angle of the bullet's path through Robinson's body, as shown on the autopsy report, at the time Reddick fired the first shot through the door of his home. The agent explained that, given the location of the bullet hole and Robinson's height, if Robinson had been shot while standing on the porch, the bullet would travel "in a straight path. It's not going to veer downward." The expert opined that the evidence was consistent with the prosecution's theory that Robinson was "looking back at someone [who] was above him, say, up here on the porch, when he was shot in the left chest and then where the bullet wound exited his right lower back."

The transcript also shows that defense counsel elicited

testimony from the agent acknowledging that she did not know how Reddick was standing or how he was holding his pistol when he fired it through the wall, and that his "arm could be angled at any direction." Counsel thus demonstrated that the agent's opinions assumed that Reddick was holding the pistol level when he fired it from inside his home. Moreover, the agent acknowledged on cross-examination that Reddick could have been standing at a slightly higher elevation than Robinson when the first shot was fired. During closing argument, defense counsel argued that Robinson's fatal chest wound was more likely caused by the first shot, when he was facing the door instead of when he was retreating. That shot, counsel argued, was fired at a downward angle by Reddick, who was taller than Robinson and was standing inside the house, which was at a higher elevation than the porch. Thus, the record plainly shows that defense counsel used the agent's testimony to support Reddick's theory of defense.

Based on the record before us, Reddick has not shown a sound basis for the trial court to reject Agent Braswell as an expert witness

under the law then in effect.[6] Although bullet-trajectory analysis has "been recognized as [an] area[] of expertise . . ., formal education in the particular subject is not a prerequisite for status as an expert; a person may be qualified as an expert when the person's knowledge is derived from experience as well as study." *Rowe v. State*, 276 Ga. 800, 806-807 (6) (582 SE2d 119) (2003) (citations omitted). See also former OCGA § 24-7-707 (2022)[7]; *Matthews v. State*, 268 Ga. 798,

---

[6] This case was tried in June 2022, prior to the 2022 legislative amendment to OCGA § 24-7-702, which became effective on July 1, 2022. With that amendment, the General Assembly extended "to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and its progeny. See Ga. L. 2022, p. 201, § 1 (amending OCGA § 24-7-702)." *Smith v. State*, 315 Ga. 287, 300 (2) (b) n.6 (882 SE2d 300) (2022); see also Ga. L. 2022, p. 201, § 3 (noting effective date). Because this case was tried before the amendment became effective, the *Harper* standard applies in this case. See *Nundra v. State*, 316 Ga. 1, 15 (5) (b) n.5 (885 SE2d 790) (2023); see also *Smith*, 315 Ga. at 300 (2) (b) n.6. Under *Harper v. State*, 249 Ga. 519, 525 (1) (292 SE2d 389) (1982), generally, once a scientific procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty.

[7] When the current Evidence Code became effective in 2013, OCGA § 24-9-67 was replaced with the nearly identical OCGA § 24-7-707, which provided: "In criminal proceedings, the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." But effective July 1, 2022, the General Assembly repealed OCGA § 24-7-707 and amended OCGA § 24-7-702 such that the latter statute now governs the admissibility of expert

28

801-803 (43) (c) (493 SE2d 136) (1997) (The court had sufficient information to find the witness qualified to testify on the location of the gun and trajectory of the bullet based on witness's training and experience. (decided under former OCGA § 24-9-67[8])). Given the evidence of the agent's training, education, and considerable

testimony in criminal as well as civil cases. That amended version of OCGA § 24-7-702 (b) provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (2) The testimony is based upon sufficient facts or data;
> (3) The testimony is the product of reliable principles and methods; and
> (4) The expert has reliably applied the principles and methods to the facts of the case.

[8] Given that former OCGA § 24-9-67 and former OCGA § 24-7-707 are nearly identical and given that there was no materially identical federal rule when this case was tried, it is appropriate to rely on cases decided under former OCGA § 24-9-67. See, e.g., *State v. Almanza*, 304 Ga. 553, 556 (2) (820 SE2d 1) (2018) ("[I]f a rule in the new Evidence Code is materially identical to a Federal Rule of Evidence, we look to federal case law[.]" However, "[i]f there is no materially identical Federal Rule of Evidence and a provision of the old Evidence Code was retained in the new Code, our case law interpreting that former provision applies."); *Mosby v. State*, 300 Ga. 450, 453 (2) n.2 (796 SE2d 277) (2017) ("Although Georgia's new Evidence Code is applicable to the trial of this case, the evidentiary requirements relating to the admissibility of expert opinion testimony in a criminal case under the new Evidence Code (OCGA § 24-7-707) are nearly identical to those that applied under the former Evidence Code (OCGA § 24-9-67). Accordingly, it is appropriate to rely, as we do in this case, on decisions under the old Code.").

experience, no objection to her as an expert in bullet-trajectory analysis would have been successful, and counsel cannot be deemed deficient for failing to make a meritless objection. See *Carter v. State*, 310 Ga. 559, 564 (2) (a) (852 SE2d 542) (2020) (Counsel did not perform deficiently by failing to make an objection to a qualified shoe-print expert.).

Additionally, we cannot say that counsel was deficient for failing to thoroughly cross-examine Agent Braswell concerning the basis for her opinions and to challenge them where possible. The evidence adduced at trial supports the trial court's conclusion that defense counsel's performance was not deficient in this respect. See *Morrison v. State*, 303 Ga. 120, 126 (5) (b) (810 SE2d 508) (2018) ("Decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel." (citation and punctuation omitted)).

(c) *Agent Walker's testimony*. Reddick argues that his trial counsel was professionally deficient for failing to object to Agent Walker's testimony describing her assumptions about how the

shooting occurred, specifically that, after Reddick had fired his pistol through the wall of his home, "[Robinson] fled away from the scene back towards his vehicle, and once he fled from the front porch back to his vehicle, while he was running away, he was shot a second time – or he was shot at a second time and that bullet actually hit him." Reddick also contends that counsel should have objected when Agent Walker testified that suspects sometimes lie and attempt to mitigate their culpability.

With respect to Agent Walker's testimony concerning her theory of how the shooting occurred, that theory was based on the agent's personal knowledge of the evidence gathered in the case in her capacity as lead investigator. Moreover, her testimony was cumulative of other admissible evidence that had already been admitted at trial, including video recordings, the location of the body, evidence gathered at the scene, the pathologist's report, bullet-trajectory analysis, and the nearly identical testimony given by another agent. When Agent Walker gave this testimony, she was explaining her assumptions concerning the evidence at the time she

31

conducted her interview with Reddick. Reddick did not ask trial counsel at the hearing on his motion for a new trial why she did not to object to this testimony. "In the absence of testimony to the contrary, counsel's actions are presumed strategic. And decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Pierce v. State*, 319 Ga. 846, 866 (11) (a) (907 SE2d 281) (2024) (citations and punctuation omitted). Given that Agent Walker's testimony was based on her personal knowledge of the investigation and was cumulative of other evidence that had already been introduced during trial, we cannot say that trial counsel's decision not to object was patently unreasonable. See *Sawyer v. State*, 308 Ga. 375, 384 (2) (b) (839 SE2d 582) (2020) (trial counsel not deficient in failing to object to cumulative testimony).

With respect to Agent Walker's testimony that suspects sometimes lie and attempt to mitigate their culpability, the transcript shows that the agent was discussing suspects generally,

and not Reddick specifically. Reddick's trial counsel explained that, given this context, she did not believe it was necessary to object.[9] Under these circumstances, we cannot say that trial counsel's decision not to object was patently unreasonable. See *Gaston v. State*, 307 Ga. 634, 642 (2) (c) (837 SE2d 808) (2020) (Declining to object to something that is not a significant issue at trial is not patently unreasonable.).

For these reasons, we cannot say that trial counsel's decision to forgo objections to Agent Walker's testimony "was so patently unreasonable that no competent lawyer would have made the same decision." *Snipes v. State*, 309 Ga. 785, 792 (3) (b) (i) (848 SE2d 417) (2020). Consequently, the trial court did not err in denying Reddick's motion for a new trial on these claims of ineffective assistance of trial counsel.

*Judgment affirmed. All the Justices concur.*

---

[9] We note that, although the "credibility of a witness shall be a matter to be determined by the trier of fact," OCGA 24-6-620, a witness's statement that does not *directly* address the credibility of another witness is not improper. See *Brown v. State*, 302 Ga. 454 (2017) ("When a witness's statement does not directly address the credibility of another witness, however, there is no improper bolstering.").