**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 17, 2026

S26A0423. JONES v. THE STATE.

WARREN, Presiding Justice.

Appellant Willie Lee Jones was convicted of felony murder based on aggravated assault and possession of a firearm during the commission of a felony in connection with the shooting death of Benjamin Francis.[1] Jones's sole claim on appeal is that the evidence

---

[1] Francis was killed on May 10, 2023. In June 2024, a Gwinnett County grand jury indicted Jones for malice murder, two counts of felony murder (based on aggravated assault and possession of a firearm by a convicted felon), aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. Michael Davis was also indicted for malice murder and other crimes related to Francis's killing. Jones was tried alone from November 4 to 7, 2024. (The record does not indicate what happened to the charges against Davis; his case is not part of this appeal.) The jury found Jones not guilty of malice murder but guilty of the remaining charges. The trial court sentenced him to serve life in prison for felony murder based on aggravated assault and five consecutive years for possession of a firearm during the commission of a felony. The remaining guilty verdicts were vacated or merged. See *Dixon v. State*, 302 Ga. 691, 697 (2017). Jones filed a timely motion for new trial, which he later amended. The trial court denied the motion on October 14, 2025. Jones filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2025 and

presented at his trial was not sufficient as a matter of constitutional due process to support those convictions.[2]  As discussed below, that claim fails, so we affirm.

(a) In evaluating the constitutional sufficiency of the evidence, we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.  See *Jackson v. Virginia*, 443 US 307, 319 (1979).  "[I]t is the jury's role to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence," *Williams v. State*, 316 Ga. 147, 151 (2023) (quotation marks omitted), meaning that "this Court does not reweigh the evidence or resolve conflicting testimony," *Gobert v. State*, 311 Ga. 305, 308 (2021) (quotation marks omitted).

---

submitted for a decision on the briefs.

[2] Jones also contends that the evidence was not sufficient to support the counts of felony murder based on possession of a firearm by a convicted felon, aggravated assault, and possession of a firearm by a convicted felon.  But Jones was not sentenced for those crimes, so his claims regarding them are moot. See, e.g., *Ellington v. State*, 314 Ga. 335, 340 (2022).

Viewed in this light, the evidence presented at Jones's trial showed the following. At 4:39 p.m. on May 10, 2023, Jones shot Francis five times, killing him, on a sidewalk of Jimmy Carter Boulevard in Norcross. Witnesses told responding investigators that Jones, who was partially paralyzed and used a wheelchair, went down the road just after the shooting, and investigators apprehended him soon after. There was blood on his shirt, and he said that "someone had cut him on the neck," but investigators did not see any such injury. Investigators found seven shell casings at the scene of the shooting, a 9mm pistol in a nearby sewer drain, and a utility knife on the ground near Francis.

Investigators later interviewed Jones; the interview was video-recorded and played for the jury at trial. Jones told investigators the following. Shortly before the shooting, he was at a convenience store on Jimmy Carter Boulevard "minding [his] business, panhandling," when Francis, whom he had never seen before, "came up around the corner, grabbed [him] by [his] neck," "put a knife behind [his] neck," and said, "[G]ive me your money." Francis then

threw Jones on the ground and "beat" him. Jones screamed for help, and when Francis fled, Jones got back in his wheelchair and tried to "chase him down." Jones then heard gunshots, but he did not have a gun and did not know who fired. He fled because the gunshots "startled" him. When an investigator told Jones that there was evidence showing that Jones shot Francis, Jones responded that Francis "tried to kill [him]."

Investigators obtained surveillance videos from the convenience store and other nearby businesses, which showed the following. Around 4:30 p.m. on the day of the shooting, Francis approached Jones, threw him to the ground, held his wheelchair on top of him, and used a utility knife to try to cut a pouch that was hanging around Jones's neck. Francis walked away from Jones at 4:31 p.m. Jones then got back in his wheelchair, spoke to a woman who witnessed the attack, and used her cell phone. At 4:37 p.m., a man (who investigators later determined was Michael Davis) arrived, spoke to Jones and the woman, and placed something on Jones's lap. Davis and the woman then walked down the sidewalk,

4

where Francis was standing, while Jones traveled through a parking lot and approached Francis from the other side. It appears that Jones and Francis argued for several seconds. At 4:39 p.m., Francis began to walk away from Jones; Jones raised his arm, as if shooting toward Francis; Francis ran toward Jones; and Francis fell on top of Jones. Jones pushed Francis away and fled in his wheelchair, as Davis and the woman ran away.

The medical examiner who performed Francis's autopsy concluded that he had been shot at least five times: once in the back, once in the back of the thigh, once in the chest, and twice in the left arm.[3] The examiner determined that each shot was fired from at least three feet away, and she collected from Francis's body three bullets and a bullet fragment. A firearms examiner concluded that the bullets and bullet fragment, as well as the seven 9mm shell casings found at the crime scene, were fired from the 9mm pistol that was found in the sewer drain. In addition, Francis's blood

---

[3] On cross-examination, the medical examiner testified that at least one of Francis's injuries could have been consistent with him "bending over approaching" Jones.

tested positive for methamphetamine, which, the medical examiner testified, "can make" a person "aggressive."

Jones testified at trial that after Francis attacked him at the convenience store and "cut [him] across the neck" and on his "face," Jones "approached" Francis and asked Francis why he "put[] his hands on" Jones. They argued, and Francis said he was "fixing to come back and kill [Jones]." Jones "fear[ed] for [his] life," so he "snatched a pistol from "Davis'[s] hip." Francis, who still had a knife, "turned back around and started running at [Jones]," and Jones shot. On cross-examination, Jones admitted that the attack at the convenience store occurred several minutes before Jones shot; that when Jones raised the pistol, Francis had his back to Jones and was walking away; and that Francis came back toward Jones after Jones began shooting.

(b) Jones contends that the evidence presented at trial was not sufficient as a matter of constitutional due process because the State failed to disprove beyond a reasonable doubt his claim of self-defense. Specifically, Jones argues that he was justified in shooting

6

Francis because the evidence showed that Francis, while under the influence of methamphetamine, had attacked Jones at the convenience store and because Jones testified on direct examination that when he later approached Francis, Francis threatened to kill Jones and ran toward him with a utility knife. This claim fails.

The evidence was sufficient to authorize the jury to conclude that at the time of the shooting, Jones did not reasonably believe that deadly force was necessary to defend himself because Francis did not present an "imminent use of unlawful force" that could cause "death or great bodily injury." OCGA § 16-3-21(a) (providing, in pertinent part, that a person is justified in using deadly force if he "reasonably believes that such … force is necessary to defend himself" against the "imminent use of unlawful force" and "to prevent death or great bodily injury to himself"). In this respect, the evidence allowed the jury to reasonably infer that after Francis's attack on Jones at the convenience store ended and Francis had walked down the sidewalk, Jones called Davis, who soon arrived at the store and gave Jones a pistol. Jones then traveled through a

nearby parking lot and approached Francis; they argued; and about eight minutes after the convenience-store attack, Jones shot Francis at least five times. He then fled the scene and initially lied to investigators, claiming that he did not know who fired the shots. And although Jones points to his testimony on direct examination that Francis said he was "fixing to come back and kill [Jones]" and "started running at [Jones]" before Jones shot, Jones admitted on cross-examination that when he raised the pistol, Francis was walking away and only came back toward Jones after Jones began shooting. See *Williams*, 316 Ga. at 150 ("It is the role of the jury to evaluate the evidence and, when doing so, the jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense." (cleaned up)).

In sum, the jury was authorized to determine that Jones did not reasonably believe that Francis posed any imminent threat of harm to him when he shot, such that Jones killed Francis in retaliation rather than in self-defense. Accordingly, the evidence

presented at trial was constitutionally sufficient to authorize a rational jury to reject Jones's claim of self-defense and to find him guilty beyond a reasonable doubt of felony murder based on aggravated assault and possession of a firearm during the commission of that felony. See OCGA § 16-3-21(a); *Reddick v. State*, 321 Ga. 73, 79 (2025) (concluding that the evidence, which allowed the jury to infer that the defendant shot the victim while he was retreating, was constitutionally sufficient to disprove the defendant's justification defense and to authorize the jury to find him guilty of felony murder based on aggravated assault and possession of a firearm during the commission of a felony); *Williams*, 316 Ga. at 150–51 (holding that the evidence, which included a video recording showing that the victim was walking away from the defendant when the defendant shot, authorized the jury to reject the defendant's claim of self-defense, and noting that even though there was evidence that the victim had aimed a gun at the defendant while they were inside an apartment, the jury could have concluded that the defendant "did not reasonably believe that [the victim] posed any

imminent threat of harm to him when he shot" the victim later in a parking lot); *Gobert*, 311 Ga. at 309 (determining that the evidence, which showed that the victim, who was part of a group that had been in a physical fight with the defendant's step-daughter, was trying to flee when the defendant shot him, was constitutionally sufficient for the jury to reject the defendant's justification defense and to find him guilty of felony murder based on aggravated assault because he and his step-daughter were not "in any danger or any imminent threat of harm" at the time of the shooting).

*Judgment affirmed. All the Justices concur.*