303 Ga. 327
FINAL COPY

S17A1994. McKOY v. THE STATE.

NAHMIAS, Justice.

Appellant Raymond McKoy was convicted of malice murder in connection with the shooting death of his estranged wife's girlfriend, Lauren Hudson. Appellant argues that the trial court erred in ruling that journal entries he had written were admissible and erred in striking his direct testimony after he refused to submit to cross-examination. We affirm.[1]

1. (a) Viewed in the light most favorable to the verdict, the evidence at trial showed the following. Appellant was married to Tameka McKoy, and they had three children together. During their marriage, Tameka, who is bisexual, introduced women into their relationship, including Hudson. Hudson lived in Chicago but came down for several visits during 2012; at that time, she

_____

[1] The victim was killed on June 22, 2013. On August 9, 2013, a Douglas County grand jury indicted Appellant for malice murder. His trial began on June 15, 2015, and on June 25, the jury found him guilty and the trial court sentenced him to life imprisonment without the possibility of parole. Appellant filed a timely motion for new trial, which he later amended with new counsel. After an evidentiary hearing, the trial court denied the motion on October 31, 2016. Appellant filed a timely notice of appeal, and his case was docketed in this Court for the August 2017 term and submitted for a decision on the briefs.

had a sexual relationship with Tameka and Appellant, both together and individually. Also during 2012, Tameka learned that Appellant was having an affair, and she and Appellant began to have frequent arguments. In November 2012, Appellant held a gun to Tameka's face while pinning her to the door during one of these arguments. In May 2013, Appellant and Tameka separated and began living apart, informally sharing custody of their children. About a month later, Hudson came to stay with Tameka for three weeks. On June 15, Appellant came to Tameka's apartment and argued with Tameka and Hudson; Tameka called the police to make him leave.

On the night of June 21, 2013, Tameka, Hudson, and the three children went to a party at the house of Shawnta Nolan, a friend of both women. They returned to Tameka's apartment around 3:00 a.m. Hudson took the children inside and then went out to smoke a cigarette. Tameka came in after them, carrying their bags. She saw her youngest son, who was two years old, sitting in his carrier in the front room and then went to the back of the apartment to check on the two older children in their rooms. She returned to the front of the apartment, and as she began to lock the door, she heard Appellant say, "Don't lock the door, she's still out there."

2

Tameka turned around to find Appellant in her apartment. She was upset and asked why he was there so late at night with no notice. He said he wanted to take their youngest son to his home. She refused, but Appellant picked up their son and walked out of the apartment. Tameka followed, again asking why he was there. Appellant expressed irritation about a picture that a friend of hers had posted on Instagram of Tameka straddling Hudson on a couch at the party. At some point during this argument, Hudson went inside. She called Nolan and said that Appellant and Tameka were fighting and that she had retrieved a gun left at the apartment by one of Tameka's friends "in case anything went down." Hudson eventually hung up, promising to call Nolan back. Appellant and Tameka continued to argue outside. Appellant said he wanted his family back, hugging their son and crying. Tameka responded, "You don't want your family back. That girl you got pregnant is your family now," referring to the woman with whom Appellant had an affair. Appellant then said something to the effect of, "I'll just solve both of our problems," and walked away from Tameka toward the apartment.

Appellant was carrying his .40-caliber Glock pistol, which he usually kept with him, in a side holster. He opened the door to the apartment, pulled the gun,

and shot Hudson, who was standing inside, four times. Three of the shots would not have been fatal — a shot through her cheek on the left side of her face, a shot through her right arm, and a shot through her right femur. At some point during the shooting, however, Hudson fell to the ground and slumped forward, and one shot entered the back of her head; this was the fatal wound. Neighbors called 911, and when police arrived, Tameka told them that Hudson had been shot by Appellant. They found Hudson slumped over, with her head in her lap. She had a small gun in her right hand, tucked under her body; the gun had not been recently fired. Hudson was struggling to breathe and died soon afterward. The medical examiner testified that the shot to the back of her head was most likely fired by someone standing over her and shooting down.

Appellant fled to his parents' house. He banged on the door, and when his mother and younger brother let him in, he was frantic. He repeatedly yelled, "she pulled a gun on me," "she had a gun," and, "I shot her." His father took Appellant's gun and locked it in the father's truck, where investigators later recovered it and matched it to shell casings found at the crime scene. Appellant's father began to experience chest pains and called 911. When the Douglasville police heard the call, they sent officers to join the EMTs because

4

they recognized the address as the one Tameka had given them for Appellant's parents. When he heard sirens arriving, Appellant panicked, said "I've got to get out of here," grabbed a butcher knife, and ran into the woods behind the house. He was found shortly thereafter by a police officer with a dog, lying face down with the knife underneath him.

(b) At trial, the defense argued that Appellant shot Hudson in self-defense because she pointed a gun at him. The argument was supported with testimony from Appellant's mother and brother that Appellant had said Hudson "pulled a gun on him," and testimony from two of Appellant's long-time friends who said that he had a law-abiding and peaceful character. The defense also called its own forensic firearms expert who testified that the shot to Hudson's arm may have spun her around and the shot to the back of her head could have come after that. The expert also testified that the position of the shot to Hudson's leg indicated that she was moving toward Appellant.

Appellant was the final witness called by the defense. He testified on direct examination, and the trial was then adjourned for the day. The next morning, with Appellant present but before the jury was brought into the courtroom, the prosecutor announced that he intended to use some entries from

5

Appellant's journals to impeach Appellant's testimony.[2] The defense argued that the journals, which were found in a bag in Appellant's car, had been seized illegally. The State did not contend that they were legally seized, but argued that even illegally obtained evidence can be used for impeachment. After a lengthy discussion, the trial court ruled that the journals generally would be admissible, heard argument on a few specific entries the State wanted to introduce, and concluded that those entries would be admissible.

After this ruling, Appellant refused to return to the witness stand to be cross-examined. His counsel asked for a five-minute recess, which the trial court denied. The court said that if Appellant did not retake the stand, it would tell the jury to "totally disregard all of his testimony." Appellant and his counsel had a discussion off the record, and then the following exchange occurred:

> APPELLANT'S COUNSEL: Your Honor, my client is stating that he does not want to retake the stand.
> PROSECUTOR: The State's position is that in the presence of the jury, we will move to have his entire testimony stricken from the record.
> THE COURT: And disregarded. That will be the —

---

[2] These journals were the subject of a pretrial motion in limine filed by Appellant, but the trial court declined to rule on the motion at that time because the prosecutor represented that he would introduce the journals only for impeachment if necessary and explained that if he decided to do so, he would raise the issue outside of the hearing of the jury and allow the court to rule on their admissibility then. Appellant agreed to this procedure.

6

APPELLANT'S COUNSEL: I'm sorry. I didn't mean to — I just — I was asking him if he understood what the Court would say to the jury. Do you understand that?
APPELLANT: Yes.
APPELLANT'S COUNSEL: You still don't want to take the stand?
APPELLANT: No.
THE COURT: Okay. We'll bring the jury in. I'll ask him to take the stand and he can tell me he's not going to take the stand. Then the State can make whatever motions it decides to make. Bring them in.

After the jury returned to the courtroom, Appellant refused to take the stand, and the court told the jury:

Ladies and gentlemen, when a witness takes the stand and testifies directly on their side of the case, in this case when he responded — this particular witness responded to the questions of his lawyer, he must then be subject to cross-examination for you to even consider anything that he said during his direct examination. When he refuses to take the stand, then I'm going to direct you that I'm striking all of his testimony and you are in no way to consider anything that he said during his direct testimony. He has presented no evidence through himself at this point, as though he never took the stand.

The defense then rested. The jury found Appellant guilty of malice murder.

(c) Appellant does not challenge the legal sufficiency of the evidence supporting his conviction. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdict, the evidence presented at trial

7

and summarized above was sufficient to authorize a rational jury to reject Appellant's claim of self-defense and find him guilty beyond a reasonable doubt of malice murder. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Anthony v. State, 298 Ga. 827, 829 (785 SE2d 277) (2016) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense."); Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citations omitted)).

2. Appellant argues that the trial court erred in ruling that his journals were admissible. He contends that the journals were illegally seized, and the State has not disputed that point. As Appellant concedes, however, evidence that was seized illegally may still be admissible for impeachment. See Hogsed v. State, 287 Ga. 255, 256 (695 SE2d 269) (2010) (ruling that journals obtained outside the scope of a valid search warrant could be used "for the limited purpose of impeaching a defendant"). See also OCGA § 24-6-613 (explaining how prior inconsistent statements, including written ones, can be used to

impeach a witness).[3]  Thus, the admissibility of Appellant's journals turns on whether they actually impeached any of Appellant's testimony.  We need not answer that question, however, because the journals that the trial court held would be admissible were never actually admitted into evidence due to Appellant's decision not to testify on cross-examination.  Any error the court may have made in that ruling in limine was therefore not preserved for appellate review.

In Luce v. United States, 469 U. S. 38 (105 SCt 460, 83 LE2d 443) (1984), the United States Supreme Court held that "to raise and preserve for review the claim of improper impeachment with a prior conviction [under Federal Rule of Evidence 609 (a)], a defendant must testify."  Id. at 43.  The Court explained that a reviewing court would be "handicapped in any effort to rule on subtle evidentiary questions outside a factual context":

> Any possible harm flowing from a district court's in limine ruling permitting impeachment by a prior conviction is wholly speculative.

----

[3]  Our opinion in Hogsed relied to some extent on a provision of Georgia's old Evidence Code, former OCGA § 24-9-20 (b).  See Hogsed, 287 Ga. at 256.  But the holding is still applicable in this case, which was tried under the new Evidence Code, because former OCGA § 24-9-20 (b) was carried forward as OCGA § 24-5-506 (b), with the addition of two enumerated exceptions not pertinent here or in Hogsed.  See State v. Frost, 297 Ga. 296, 299 (773 SE2d 700) (2015) ("Some . . . provisions of the new Evidence Code were carried over from our old Evidence Code, and when courts consider the meaning of those provisions, they may rely on Georgia decisions under the old Code.").

9

The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling. . . . When the defendant does not testify, the reviewing court also has no way of knowing whether the Government would have sought to impeach with the prior conviction. If, for example, the Government's case is strong, and the defendant is subject to impeachment by other means, a prosecutor might elect not to use an arguably inadmissible prior conviction. Because an accused's decision whether to testify "seldom turns on the resolution of one factor," a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify. . . . Even if these difficulties could be surmounted, the reviewing court would still face the question of harmless error. Were in limine rulings under Rule 609 (a) reviewable on appeal, almost any error would result in the windfall of automatic reversal; the appellate court could not logically term "harmless" an error that presumptively kept the defendant from testifying. Requiring that a defendant testify in order to preserve Rule 609 (a) claims will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to "plant" reversible error in the event of conviction.

Id. at 41-42 (citations omitted).

Our Court of Appeals followed Luce in Warbington v. State, 316 Ga. App. 614 (730 SE2d 90) (2012), a case dealing with a pretrial denial of a motion to exclude a conviction that the State planned to offer to impeach the defendant. See id. at 615-617. The court concluded that Luce's approach is appropriate in

10

Georgia because it is "axiomatic that a conclusion that reversible error occurred requires a showing of error and harm and that '(a)n appellant has the burden of proving trial court error by the appellate record.'" Id. at 618 (citation omitted). Thus, the court held: "Because Warbington declined to testify, we will not speculate on the substantive merits of his contention that the trial court's pretrial ruling was prejudicial error." Id.

Although the impeachment evidence at issue in this case is prior inconsistent statements rather than prior convictions, the rationale of Luce and Warbington is applicable and compelling.[4] Even more than a single prior conviction, the admissibility of Appellant's journals is a "subtle evidentiary question[ ]" that requires a "factual context" to review accurately. Luce, 469 U. S. at 41. For example, although a few of Appellant's specific journal entries were discussed by the parties and the trial court, it is not clear if these were the only entries the State wanted to put into evidence, nor is it clear exactly which of Appellant's statements on direct examination the State sought to impeach with any of the entries. Moreover, the substance of Appellant's testimony as the

---

[4] Other courts have followed Luce when addressing impeachment evidence of prior conduct proffered in limine to demonstrate a witness's character for truthfulness or untruthfulness. See United States v. Dimatteo, 759 F2d 831, 833 (11th Cir. 1985); United States v. Weichert, 783 F2d 23, 25 (2d Cir. 1986).

cross-examination progressed might have made particular journal entries relevant or irrelevant for impeachment, even the entries the trial court initially ruled admissible, and if the prosecutor liked how the cross-examination was proceeding, he could have decided not to ask about any or all of the entries. Having a full factual context is essential to meaningful appellate review of the trial court's evidentiary ruling.

In addition, like the alleged errors in Luce and Warbington, the alleged error in ruling the journals admissible in limine must be evaluated for harm to Appellant's substantial rights. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). See also Smith v. State, 299 Ga. 424, 431 (788 SE2d 433) (2016) (explaining that "[t]he new Evidence Code continues Georgia's existing harmless error doctrine for erroneous evidentiary rulings"). Harm cannot be accurately evaluated, however, in the absence of Appellant's complete testimony and the actual admission of the journals or only particular entries from the journals. Although Appellant testified on direct examination, we know nothing about the testimony he would have given on cross-examination (or redirect-examination). We do not know, for example, what

kind of context he would have given to any journal entry asked about by the State, or whether any testimony regarding the journals would have been cumulative of other evidence offered by the State.[5]

Because Appellant refused to testify on cross-examination and the disputed journals were never actually admitted into evidence, he has not preserved for appellate review his claim that the trial court committed reversible error by ruling in limine that the journals would be admissible.[6]

3.      Appellant's remaining enumerations of error are variations on his claim that the trial court should not have struck his direct testimony when he refused to be cross-examined.  In our view, the trial court's ruling was an

---

[5] We note that Appellant may have been able to raise other objections to the journals based on how the State sought to use them, such as an authentication objection if Appellant denied writing the journal entries and the State failed to provide adequate evidence to the contrary.  See OCGA § 24-9-901 (a) ("The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").  Again, we do not know if such objections would have been appropriate or how the State would have responded.

[6] Many state and lower federal courts have followed Luce, see Warbington, 316 Ga. App. at 617 (collecting cases), but a smaller number of state courts have not, reasoning instead that a clear proffer of what the defendant will say in his testimony is sufficient to allow for meaningful harmless error review, see Warren v. State, 124 P3d 522, 527 (Nev. 2005) (collecting cases).  Even a detailed proffer, however, cannot overcome the problem that the defendant is not bound to the proffer, the State is not required to introduce the impeachment evidence simply because it was ruled admissible, and the trial court may change its ruling.  See Luce, 469 U. S. at 41-42.  A proffer cannot adequately anticipate the rest of the evidence presented at trial or the actual interaction of the testifying defendant and the State's presentation of impeachment evidence.

appropriate response to the unusual situation Appellant's actions created.

". . . If an accused testifies, he or she shall be sworn as any other witness and, except as provided in Code Sections 24-6-608 and 24-6-609 [which are not pertinent in this case], may be examined and cross-examined as any other witness. . . ."  OCGA § 24-5-506 (b).  See also Scott v. State, 270 Ga. 93, 94 (507 SE2d 728) (1998) ("Although a criminal defendant cannot be compelled to testify against himself, once he elects to testify and takes the stand, he can be examined and cross-examined as any other witness." (citations omitted)).  Thus,

> when a defendant voluntarily takes the stand in his own behalf and testifies as to his guilt or innocence as to a particular offense, his waiver [of the right against self-incrimination] is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing.

Hubbard v. State, 173 Ga. App. 127, 129 (325 SE2d 799) (1984) (citations and punctuation omitted).

Once Appellant withdrew his consent to be cross-examined as a witness, he could no longer be treated as a witness at all.  "'(W)hen a witness declines to answer on cross-examination certain pertinent questions relevant to a matter

14

testified about by the witness on direct examination, all of the witness' testimony on the same subject matter should be stricken.'" Hubbard, 173 Ga. App. at 129 (emphasis omitted) (quoting Smith v. State, 225 Ga. 328, 331 (168 SE2d 587) (1969)). See also Soto v. State, 285 Ga. 367, 368 (677 SE2d 95) (2009) ("Generally, when a witness refuses to continue to testify after having already done so, the proper remedy is to strike pertinent portions of the witness' testimony."). Here, Appellant refused to submit to *any* questions on cross-examination, so the trial court properly struck *all* of his direct testimony.

Appellant also argues that striking his testimony deprived him of his rights under the United States and Georgia Constitutions to defend himself and to due process. That simply is not true. In fact, five other witnesses testified for the defense, and all of them supported his self-defense theory. And the procedure the trial court followed before striking Appellant's testimony gave him due process. The court clearly informed Appellant of the consequence if he refused to retake the stand, allowed Appellant to consult his counsel, and then asked Appellant to make an informed decision. Appellant elected not to retake the stand and thereby suffer the consequence of his testimony being excluded from the evidence he presented in his defense.

For these reasons, Appellant's claims of error related to the striking of his

15

direct testimony fail.

Judgment affirmed. All the Justices concur.

Decided March 15, 2018.

Murder. Douglas Superior Court. Before Judge James.

Thomas M. West, for appellant.

Brian K. Fortner, District Attorney, Sean A. Garrett, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Meyerhoefer, Assistant Attorney General, for appellee.