**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0143
James Sims
v.
The State

On appeal from the Superior Court of Fulton County
No. 16SC143159

Decided: June 2, 2026

ELLINGTON, Justice.

A Fulton County jury found appellant James Sims, as well as his co-defendants James Calhoun and Jonathan Banks (altogether, "the defendants"), guilty of malice murder and other crimes in connection with the shooting death of Pamela Williams, the burglary of her home, and other crimes.[1] Sims contends that

---

[1] The crimes occurred on November 30, 2013. On April 12, 2016, Banks was indicted along with his co-defendants, Calhoun and Sims, by a Fulton County grand jury for malice murder (Count 1); felony murder predicated on aggravated assault (Counts 2); felony murder predicated on burglary (Count 3); aggravated assault (Count 5); burglary in the first degree of the home of Pamela Williams (Count 6); and possession of a firearm during the commission of a felony (Count 9). Banks was charged individually with felony murder predicated on possession of a firearm by a convicted felon (Count 4) and possession of a firearm by a convicted felon (Count 10). Sims was charged individually with burglary in the first degree of the home of Deborah Huddleston (Count 8) and Calhoun was charged individually with burglary in the first degree of the home of Corey Robinson (Count 7). The court severed Counts 7 and 8, and those charges were not presented to the jury.

the evidence was insufficient to support the jury's verdicts and that the verdicts were contrary to the weight of the evidence. He also contends that the trial court erred in admitting certain evidence and in denying motions to strike the jury panel and to sever the defendants. Finally, he argues that he received constitutionally ineffective assistance of counsel. As we explain further below, with respect to some of these claims of error, Sims has not made any meaningful argument for why the claim should prevail based on the applicable law and the specific facts of the case, and so he has not carried his burden of showing error on appeal. As to those claims of error that Sims does support with argument, they fail for the reasons set out below.

Viewed in the light most favorable to the jury's verdicts,

---

After a joint jury trial that began on September 27, 2016, Sims was found guilty on all charges. The trial court sentenced Sims to life in prison with the possibility of parole for malice murder (Count 1); 20 years' probation, consecutive to Count 1, for burglary (Count 6); and five years' probation, consecutive to Count 6, for the firearm offense (Count 9). The remaining counts (Counts 2, 3 and 5) merged or were vacated by operation of law.

On November 16, 2016, Sims timely filed a motion for new trial, which he amended on December 18, 2020, and October 15, 2021. After a hearing, the trial court denied the motion on July 27, 2023. On July 31, 2023, Sims timely filed a notice of appeal. On September 3, 2025, this appeal was docketed to the term beginning in December 2025, and the case was submitted for a decision on the briefs.

We note the almost seven-year delay in resolving Sims's motion for new trial and another two-year delay for the appeal to be docketed in this Court. The trial court apparently had not ruled on Sims's first new trial motion, filed in 2016, when Sims amended that motion in 2020. And after Sims amended his new trial motion in 2020, he did not file a second amended motion until almost a year later. We "reiterate that it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." *Owens v. State*, 303 Ga. 254, 258 (2018) (quotation marks omitted).

2

the trial transcript shows the following. On the evening of November 30, 2013, the defendants met in front of Sims's house in the Amhurst subdivision in Fulton County. The defendants' movements in and through the neighborhood that evening were witnessed by Jerry Link, the subdivision's security officer. At dusk, the defendants walked the short distance from Sims's house to Williams's house along a "cut," a makeshift footpath through neighboring yards in the Amhurst subdivision. At this point, Link lost sight of the defendants. Williams, who was home alone, called 911 at 8:07 p.m. to report suspicious activity outside her home. While she was on the phone with the 911 operator and his supervisor, she reported hearing people ringing her doorbell repeatedly, her dog barking, and then people entering her home. Williams hid in the closet of her master bedroom, crouching low and whispering to the 911 operator as the defendants searched her home for valuables. Then the 911 operator heard Williams scream. Shortly thereafter, the telephone connection was lost. Williams screamed because Banks had discovered her hiding in the closet. Banks pressed his gun to Williams's head and shot her.

Although Williams's alarm system was armed, it was not triggered when the defendants entered her home because the patio window through which they entered did not have an alarm sensor. Instead, the alarm was triggered at 8:20 p.m., shortly after the police arrived and entered the house. Officer Michael Guin arrived at Williams's home at 8:14 p.m. and waited for backup to arrive. When Corporal Willis Reed arrived, they entered the home and found Williams breathing but unconscious, slumped to the floor in her bedroom closet with a gunshot wound to the head. Guin noticed that Williams had been hiding in a smaller "closet within the closet" and that her phone had fallen between her knees. Paramedics transported Williams to Grady Hospital. She died there on December 2, 2013. The cause of death

was a single, contact gunshot wound to the head. The medical examiner testified that Williams likely would have been sitting on the floor, looking up at Banks, when he pressed the gun's muzzle to her forehead and shot her.

After Banks shot Williams, he and the others fled from the house on foot and, shortly thereafter, sped out of the neighborhood in their cars. Banks hid at the home of Sims's cousins, Cassandra and Joseph Hockaday. According to the Hockadays, who gave statements to the police and testified at trial, Banks admitted to them that he, Calhoun, and Sims had broken into Williams's home. Banks confessed that, when he discovered Williams in her closet, he "accidentally" shot her. Banks also said he hid the murder weapon "somewhere around the [Hockadays'] house" but, later, he and Calhoun moved it.

In the following days, Banks called his mother several times. Banks's mother asked him whether he had been involved in the shooting, and Banks admitted that he "was back there." After the shooting, Banks told his father that "me and my crew f***** up." Banks's father reported this statement to an investigator. When Banks' father asked Banks whether he had shot and killed someone, Banks responded "I don't know." Banks also asked his parents for money so that he could "get out of town." Banks's father gave the police the street names of five people in his son's "crew." Shortly thereafter, the police obtained warrants for Banks, Calhoun and Sims, and they were arrested in mid-December of 2013.

Link, the subdivision's security officer, testified that, during the evening of November 30, as he patrolled the neighborhood in his car, he saw a group of young men, including Calhoun, Banks, and Sims, standing in front of Sims's house. Sims's and Calhoun's houses are near each other on the same

4

street, and Banks was staying with Sims. Link saw Calhoun, Banks, and Sims enter a silver-gray car with two other people at around 7:40 p.m. He watched the car leave but did not follow it. About ten minutes later, while Link was patrolling the subdivision, he saw the same silver-gray car parked on the side of the road near Williams's house. Link testified that he saw the car's interior lights turn on as several people exited the car. Then the car sped away. Given that the neighborhood had experienced "[w]ell over 150" burglaries, Link was suspicious of what he was seeing. He began scanning the area and saw Banks standing near a retention pond by Williams's house. He also spotted a group of young men, including Calhoun and Sims, standing behind her house.

Believing that the young men were returning to either Sims's or Calhoun's house by way of the path through the woods, Link drove back to Sims's home. When he got there, he did not see the men, but he saw a red Pontiac and a blue Chevy parked in front of Calhoun's house. Link had seen the defendants in those cars earlier in the day. He testified that he had recorded the tag numbers of those cars as well as the tag numbers for the silver-gray car. After a few minutes, Link returned to Williams's street to see if he could find the young men. As he passed by the home of Eddie Muhammad, he spotted a group of young men, including Calhoun, Banks, and Sims, running through the neighborhood toward the path that led back to their homes. Then, at 8:22 pm, Link saw the red and blue cars that had been parked in front of Calhoun's and Sims's houses speed out of the subdivision. Later that evening, Link shared this information with the police.

The following day, Link discovered a jewelry box lying on the ground along the path he had seen Calhoun, Banks, and Sims use to flee after the shooting. Believing that the box may have

5

been stolen from Williams, he called the police to collect it. In addition to the jewelry box, the police collected a ring box, a black hooded sweatshirt, and a black skull cap along the path through the woods near Williams's home. Link testified that, also on the day following the shooting, he saw Sims's mother cleaning out the garage and disposing of clothing, including an orange jacket matching one he had seen Sims wearing on the night of the shooting. Link also saw Calhoun "roaming around[,] looking at the ground" in the area where Link had discovered the jewelry box. Link testified that much of what he had seen concerning the defendants' movements from the night of the shooting had been recorded on his car's dash camera and that he turned those recordings over to the police. Several of those recordings were admitted in evidence and played for the jury.

Williams's immediate neighbors also testified concerning events on the night of the shooting. Louis Lindo testified that, as he was standing at the end of his driveway, he saw a group of young men walking toward Williams's house. Muhammad testified that his dogs were barking that evening like someone was walking by his house. Joshua Williams, who lived next door to Williams, saw a group of five young men run from behind her house along the cut between their houses as he was getting clothes out of the trunk of his car. Yvens Resilard, whose home was located between Williams's and Sim's homes, testified that around 8:00 p.m., he heard his dogs barking excessively, and when he went downstairs to check on them, he noticed that his motion sensor lights were on. Derrick McKnight, who was visiting his sister, testified that he spotted a group of five young men lurking outside his sister's home. McKnight's sister's home was also located between Williams's and Sims's homes. When McKnight turned on the outside floodlights, he saw five young men wearing dark clothing. One wore a skull cap. McKnight

6

observed the men "scatter" and try to "hide." The men then all ran off together in the same direction.

The State also admitted evidence of prior acts involving Calhoun and Sims. Marcus Greer, who was given immunity from prosecution in exchange for his cooperation, testified that he, Calhoun, Sims, and two others broke into Melissa Burke's home on January 13, 2013. Burke had been home alone when she heard the doorbell ring. From her upstairs window, she saw two young men at her front door. When they continued to ring her doorbell, Burke called 911. As she did so, the young men climbed through a second-floor window on the back of her home. They began searching for things to steal. Burke testified that she hid in the closet, but one of the young men found her. She saw the closet door swing open, heard a gunshot, and realized that she had been shot. The shooter kept firing until his gun ran out of ammunition. Burke testified that someone said: "Man, she's dead. Let's just get out of here." As the young men left her home, they triggered her alarm system. The alarm system did not go off when they entered the home because they had entered through a window that did not have an alarm sensor. Burke identified Calhoun at trial as the man who shot her.

Monica Salinas, who lived in the Cooks Landing subdivision in Fulton County, testified that on September 18, 2013, she heard a doorbell ring and saw two young men standing outside her front door. When she did not answer the door, they rang her doorbell "20, 15 times consistently, just constantly ringing the doorbell." Moments later, her dogs started barking in the back yard. She called 911, and while she was on the phone, one of the men threw a rock through her window, shattering the glass. When the men spotted Salinas in the upstairs window, one threw a rock at her and then fled. Shortly thereafter, the two men

7

were apprehended by the police. Salinas and a sanitation worker who saw the men fleeing from Salinas's home identified one of them as Calhoun.

On October 30, 2013, Corey Robinson's home in the Amhurst subdivision was burglarized. The burglars stole laptop computers, watches, a television, and a jewelry box. The police recovered a palm print from the home and later matched it to Calhoun's palm print.

1. Sims asserts that his "conviction was based upon insufficient evidence" and that the "State failed to present competent admissible evidence to the jury at trial that proved [him] guilty beyond a reasonable doubt of the charges brought against him." When evaluating the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 US 307, 319 (1979) (emphasis omitted).

(a) The evidence is sufficient to show that Sims was a party to the crime of malice murder. A person is guilty of malice murder if "he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1(a). See also *Welch v. State*, 306 Ga. 470, 473 (2019). A jury may find a defendant guilty of malice murder if the evidence shows beyond a reasonable doubt either that he directly committed the crime or that he was a "party thereto." OCGA § 16-2-20(a). A person is a party to a crime if, among other things, he aids or abets in its commission. OCGA § 16-2-20(b)(3). See also *Carter v. State*, 314 Ga. 317, 319 (2022). "[P]roof of a shared criminal intent with the actual perpetrator is necessary to establish that one is a party to the crime," *Sams v. State*, 314 Ga.

8

306, 310 (2022) (citation omitted), and the jury may infer a shared criminal intent from the defendant's "presence, companionship, and conduct before, during, and after the offense," *Jones v. State*, 314 Ga. 214, 232 (2022) (citation omitted).

A rational jury could infer from Sims's actions before, during, and after the shooting that he shared a common criminal intent with Banks. With respect to Banks's criminal intent, the evidence supports the jury's finding that he intentionally killed Williams. The jury could infer from the medical examiner's expert testimony concerning Williams's contact gunshot wound to the head that Banks had deliberately pressed the gun to her head and executed her after he discovered her crouched down, hiding in the closet. And a rational jury could infer from Sims's actions before, during, and after the shooting that he, Banks, and Calhoun—members of a burglary "crew"—had aided and abetted each other in a common scheme to burglarize homes and to kill any witnesses. Link saw the defendants lurking together around Williams's home before the burglary and then fleeing together afterward. Link also testified that he saw Sims's mother discarding the clothes Sims wore the night of the crimes. Based on the evidence presented, the jury could also infer that the burglary crew's scheme was to verify that a home was empty before entering it by repeatedly ringing the doorbell. They would enter the home through windows without alarm sensors. And they carried firearms because, if they came upon a homeowner, they would not leave the homeowner alive to identify them. In fact, Sims had participated in a prior robbery where Calhoun had similarly shot the homeowner multiple times and left her for dead after the crew discovered her hiding in her closet. This evidence was sufficient to support Sims's conviction for malice murder as a party to the crime. See, e.g., *Scoggins v. State* 317 Ga. 832, 837–39 (2023) (holding evidence sufficient to support defendant's

9

convictions of malice murder as a party to the crime because he was present when the victim was shot, witnesses testified that defendant and the shooter were together most of the day, they were the last two people seen with the victim before her body was found, defendant did not seek medical aid for the victim, and he left the scene with the shooter in the victim's vehicle); *Jones*, 314 Ga. at 232 (holding evidence sufficient to support defendant's conviction for malice murder as party to the crime when defendant belonged to a street gang and had a motive to kill the victim, was present at the scene of the shooting, and was in contact with the shooter before and after the crime). This claim of error, therefore, fails.

(b) The same evidence set forth above also supports Sims's convictions for burglary, OCGA § 16-7-1(b),[2] and possession of a firearm during the commission of a felony, OCGA § 16-11-106(b).[3] See, e.g., *Jackson v. State*, 305 Ga. 614, 617 (2019) (explaining that, because defendant aided in committing theft and other felonies committed inside the apartment, the evidence was sufficient to authorize his conviction for burglary); *Scoggins,* 317 Ga. at 839 ("Given our conclusion that there was

---

[2] OCGA § 16-7-1(b) provides, in pertinent part:

A person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant dwelling house of another or any building, vehicle, railroad car, watercraft, aircraft, or other such structure designed for use as the dwelling of another.

[3] OCGA § 16-11-106(b) provides, in pertinent part: "Any person who shall have on or within arm's reach of his or her person a firearm or a knife having a blade of three or more inches in length during the commission of, or the attempt to commit" any of the listed offenses, including "(1) Any crime against or involving the person of another; [and] (2) The unlawful entry into a building or vehicle[.]"

sufficient evidence to sustain Scoggins's murder conviction under the theory that he was a party to the murder of Daniel, the evidence was sufficient to support Scoggins's conviction for possession of a firearm during the commission of a felony under that theory, as well.")

2. Sims contends that the jury's verdict "is contrary to the laws and principles of justice and [equity] and is strongly against the weight of the evidence," and that the trial court failed to exercise its discretion as "the thirteenth juror" to grant him a new trial, citing OCGA §§ 5-5-20 and 5-5-21.

> Grounds for a new trial under these Code sections are commonly known as the "general grounds," and the two statutes give the trial court broad discretion to sit as a thirteenth juror and weigh the evidence on a motion for new trial alleging these general grounds. Whether to grant a new trial on the general grounds is a decision left to the sole discretion of the trial court. Thus, on appellate review, our role is limited to determining whether the trial court exercised that discretion, and in the absence of affirmative evidence to the contrary, we presume that the trial court did so.

*Gines v. State*, 324 Ga. 46, 61 (2026)(citations and quotation marks omitted).

In its order denying Sims's motion for new trial, the trial court specifically addressed Sims's claims "in accordance with the discretion given the Court by OCGA §§ 5-5-20 and 5-5-21" and concluded:

> As to each Defendant, the Court FINDS this is not an exceptional case in which the evidence

11

preponderates heavily against the verdict, and thus the Court DECLINES to reverse Defendants' respective convictions. See *White v. State*, 293 Ga. 523, 524 (2013) (this "discretion should be exercised with caution and invoked only in exceptional cases where the evidence preponderates heavily against the verdict.").

Nothing in the record supports Sims's claim that the trial court failed to consider his motion or to exercise its discretion as the thirteenth juror. See *Myers v. State*, 313 Ga. 10, 14 (2021) (holding that the trial court's finding of "this is not an exceptional case in which the evidence preponderates heavily against the verdict" sufficiently demonstrated the trial court fulfilled "its duty in ruling on the general grounds to weigh the evidence and consider the credibility of the witnesses."). Accordingly, this claim of error fails.

3. Sims contends the trial court erred in denying a motion to strike the jury pool after a potential juror "admitted to making prejudicial statements to members of the jury pool." Specifically, Panelist 49 (later selected as Juror 8) made a comment to Panelist 48 that she thought defendants were "guilty." Panelist 48 brought the matter to the trial court's attention after the jury had been selected but before they were sworn and impaneled. Counsel for all three defendants objected and asked for the entire jury panel to be stricken as it was likely tainted by these comments. The remaining potential jurors, however, had already been dismissed, and there were no other potential jurors available for jury selection. The trial court ruled that the appropriate remedy was to strike Juror 8 from the petit jury. Sims objected and asked the court to strike the entire jury and to restart the jury selection process. Sims contends the trial court's ruling constituted

reversible error. We disagree.

> In assessing whether the trial court should have excused all members of the jury panel who might have been privy to any unauthorized comments or discussions, the appropriate inquiry is whether the remarks were inherently prejudicial and deprived appellant of his right to begin his trial with a jury free from even a suspicion of prejudgment or fixed opinion.

*Slaughter v. State*, 289 Ga. 790, 792 (2011) (cleaned up). "But where the facts establish only gossamer possibilities of prejudice, prejudice is not inherent." *Kinder v. State,* 284 Ga. 148, 150 (2008) (citation omitted).

The transcript shows that the trial court questioned Panelist 48, who had not been selected for the jury but who had heard the comment. Panelist 48 told the trial court that Juror 8, who had been sitting next to her, leaned over and whispered the comment to her. Panelist 48 said that, to the best of her knowledge, Juror 8 had made the comment to her alone. Panelist 48 did not tell anyone about the comment except for the judge's clerk. Panelist 48 was "almost positive" that no other juror heard the comment. Moreover, Juror 8 told the court that she made this comment to Panelist 48 only. She said that she made the comment once and voiced no other opinions to anyone else.

In short, the record shows that the person making the improper comment was stricken from the jury, and the only person who heard the comment was never seated on the jury. Further, there is no evidence that any seated juror could have heard the comment and been prejudiced by it. Consequently, Sims has not shown that he was denied his right to a fair trial when

13

the court denied his request to dismiss the jury panel and start jury selection anew. For these reasons, the trial court did not err in denying Sims's motion. See *Slaughter*, 289 Ga. at 792.

4. Sims argues that the trial court erred when it admitted over objection "other acts" evidence pursuant to OCGA § 24-4-404(b) which impermissibly placed Sims' character into evidence. In his appellate brief, Sims quotes legal authorities pertaining to the admission of other-acts evidence. However, he does not describe with any specificity the "other acts evidence" to which he objected. He does not cite a specific ruling by the trial court admitting the evidence nor does he cite any pertinent facts, specific dates, or witness testimony from the trial transcript.[4] More significantly, he presents no meaningful legal argument on the merits of whether the other acts evidence was admissible. Instead, he quotes text from legal authorities without any explanation of why the text is pertinent to the facts of the case.

As a general matter, a legal argument in support of a claim of error on appeal involves the presentation of reasoning based on the law and the specific facts of the case aimed at persuading a court that the claim of error has merit. The only such argument that Sims makes is that the trial court did not detail in its order denying the motion for new trial certain parts of its reasoning for admitting the other acts evidence. But a trial court does not need to make specific findings of fact or conclusions of law when denying a motion for new trial, so that argument fails. See, e.g., *Carr v. State*, 275 Ga. 185, 187–88 (2002) (trial court not required to make specific written findings of fact and conclusions of law when denying a motion for new trial). And as to the merits of

---

[4] Sims cites only to the court's order denying his motion for a new trial, which summarily concluded that it did not err in admitting the other acts evidence at trial.

14

Sims's claim—that the Rule 404(b) evidence was not admissible—Sims does not make any argument at all. Sims does not identify by citation to the record any testimony or facts that support his claim of error, though this Court's rules require that he do so. See Supreme Court Rule 19 (1)(e), (g); Rule 22(2). In fact, in his "Statement of the Case," Sims does not set "out the material facts relevant to the appeal" as required by Supreme Court Rule 19(1)(e). Rather, he uses that section to list his enumerations of error. Although this Court could attempt to deduce what Sims's appellate argument concerning the other acts evidence might be from the record, it is not the function of this Court to make an appellant's legal argument for him. See *Pierce v. State*, 319 Ga. 846, 855 (2024) ("Because Appellant has not specifically identified the objectionable testimony, has not included any meaningful legal analysis, and simply makes vague assertions of error and cites to one large chunk of the transcript, he is not entitled to a review of this claim." (cleaned up)). Nor is it "this Court's job to cull the record on behalf of [an appellant] to find alleged errors." *Henderson v. State*, 304 Ga. 733, 739 (2018) (cleaned up).

Because Sims has failed to identify what evidence he claims should not have been admitted or to present a legal argument in support of this claim of error, he has not met his burden of showing that the trial court erred in this respect. Consequently, this claim of error fails. See, e.g., *McKoy v. State*, 303 Ga. 327, 333 (2018) ("[I]t is axiomatic that a conclusion that reversible error occurred requires a showing of error and harm and that an appellant has the burden of proving trial court error by the appellate record." (cleaned up)); *Swindle v. Swindle*, 221 Ga. 760, 762 (1966) ("In order for this court to determine whether or not a trial judge erred in admitting evidence we must be able to determine what evidence is claimed to have been illegally admitted and what objection was made to the evidence at the time

15

it was admitted.").

5. Sims contends that the trial court erred in admitting in evidence a life-size replica of Williams's bedroom closet because it was not relevant to any issue at trial. Further, he argues that, even if it was relevant, its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See OCGA § 24-4-403 ("Rule 403"). Sims also contends that the replica was inaccurate, inherently prejudicial, and likely improperly impacted the outcome of the trial. Consequently, he argues, the trial court abused its discretion in allowing the state to use the demonstrative evidence. We disagree.

At trial, the defendants objected to the use of the replica, asserting that "there was absolutely nothing probative about it." After hearing arguments from the State and the defendants, the court ruled that it would "permit the exhibit and the testimony related to the exhibit." Based on the record in this case, the trial court did not abuse its discretion in allowing the State to use the replica of Williams's closet as a demonstrative aid.

A trial court has wide discretion in admitting demonstrative evidence, and a party offering such evidence must lay "a proper foundation establishing a similarity of circumstances and conditions." *Smith v. State*, 299 Ga. 424, 435 (2016) (citation and punctuation omitted). This requires showing "not that the conditions of the demonstration are identical to the actual event at issue, but that they are so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." *Rickman v. State*, 304 Ga. 61, 64 (2018) (citation omitted). "Like any evidence,

16

demonstrative evidence is subject to Rule 403, and should be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Robinson v. State*, 308 Ga. 543, 548 (2020).

In this case, Officer Guin testified that the closet replica was to scale and "appears to be the layout of how I remember the doorframe and the victim laying." He testified with reference to the replica about how he entered the bedroom, how he entered the smaller closet within the bigger closet where Williams had been hiding, where he saw Williams's body, where her body was likely positioned when she was shot, where her cell phone fell, and where Banks may have been standing when he shot her. The State contends that the replica helped illustrate the officer's testimony and allowed the jury to understand the spatial relationships in a way that the photographs of the crime scene did not. As the prosecutor argued in closing, the replica illustrated how Banks would have entered the smaller closet, turned to face Williams (who was crouched down), and then pressed his gun against her head and fired it. The replica, thus, had some probative value in explaining the sequence of events to the jury.

Sims has not identified any unfair prejudice that resulted from the use of the closet replica as demonstrative evidence. He has not pointed to anything in the record to the effect that the replica was not consistent with the evidence in the case, that it was inaccurate or misleading, or that the limited presence of the replica in the courtroom overemphasized certain evidence. Considering the record as a whole, the trial court's admission of this demonstrative evidence was not an abuse of discretion. See *Robinson v. State*, 308 Ga. 543, 548 (2020) (concluding that the trial court did not abuse its discretion in allowing the State to use firearms as demonstrative aids given that the demonstration was

17

somewhat probative of the State's theory of the case, and the jury was informed the guns were not those used in the alleged crimes).

6. Sims baldly asserts, in a single claim of error, that the trial court erred in denying his motions for a mistrial with respect to (a) the life-sized replica of Williams's closet;  (b) the testimony of Link concerning "prior bad acts evidence" and "negative activities";  and (c) the testimony of Sheryl Collins concerning prior acts by Banks and Sims. In his brief, Sims cites to that portion of the record where the trial court denied each motion and then sets forth black letter law pertaining to granting motions for mistrial generally. However, he does not identify with citation to the record the pertinent facts or statements at issue. Nor does he make any legal argument explaining why the trial court's ruling constituted reversible error. As we explained in Division 4, it is not the function of this Court to make an appellant's argument for him. Because Sims has failed to carry his burden of showing that the trial court erred in this respect, the claim of error fails. See, e.g., *McKoy*, 303 Ga. at 333.

7.  Sims contends the trial court erred by admitting in evidence over objection a black hoodie (State's Exhibit 172) "for lack of foundation and failure to establish chain of custody through witness Derrick McKnight."  The record does not support this claim of error.

The trial court did not admit the hoodie through Derrick McNight; rather, it was properly admitted after the State laid the foundation for its admissibility through Officer Duncan. Officer Duncan identified the hoodie and testified that he personally retrieved it and placed it into an evidence bag. Thereafter, the State tendered it into evidence, and it was admitted without objection. We see no error. See *McDowell v. State*, 309 Ga. 504, 507 (2020) (explaining that, pursuant to OCGA § 24-9-901(a),

18

authentication can be made via testimony of a witness with knowledge of the item and distinctive characteristics of the item).

8. Sims contends the trial court erred in denying his motion to sever the defendants' trials because the court failed to adequately consider the following factors: (a) whether evidence offered against the other defendants pursuant to OCGA 24-4-404(b) ("Rule 404(b)") would have a prejudicial "spillover effect" on him, (b) whether curative instructions would be sufficient, (c) whether the jury could compartmentalize evidence that applied only to him, and (d) the degree to which the defendant's defenses were antagonistic. The record does not support this claim of error.

"A trial court has the discretion to grant or deny a severance in a joint trial." *Ruff v. State*, 314 Ga. 386, 386 (2022) (citation and punctuation omitted). See OCGA § 17-8-4(a).

> In ruling on a motion to sever, a trial court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses. It is incumbent upon the defendant who seeks a severance to show clearly that he will be prejudiced by a joint trial, and in the absence of such a showing, the trial court's denial of a severance motion will not be disturbed. We review a trial court's decision to grant or deny a severance motion for an abuse of discretion.

Id. at 386–87 (citations and quotation marks omitted).

On August 19, 2016, the trial court held a hearing on Banks's motion to sever the defendants' trials. Sims and Calhoun joined the motion and adopted the arguments made by their co-

19

defendant. Sims argued that the 404(b) evidence, which implicated Calhoun and Banks, would be prejudicial "spillover" evidence. The State argued at length that severance was not required, concluding that defendants had not shown prejudice. The State argued that the evidence was not confusing and that the defendants' defenses were not antagonistic given that they all appeared to be arguing that someone else perpetrated the crimes. After argument, the trial court denied the motion to sever the defendants' trials but granted the motion to sever Counts 7 and 8.

In its order denying Sims's motion for new trial, the trial court found as follows:

> Here, Defendants were generally charged with the same crimes, the State presented the same evidence and fact pattern as to the charged offenses, the jury was appropriately instructed, the jury returned separate verdicts, and there is no evidence the jury was confused in considering the State's case in connection with each of the defendants. The Court FINDS that each [of the] Defendants has failed to show prejudice or a denial of due process. See *Smith v. State*, 308 Ga. 81, 85-87 (2020). While Defendant Calhoun is correct the State was authorized to tender Rule 404 (b) evidence against Defendants Sims and Banks, the Court provided a limiting instruction before the admission of such evidence to properly guide the jury's use of that evidence. See *Brooks v. State*, 332 Ga. App. 396 (2015) (rejected severance claim based on Rule 404 (b) evidence against co-defendant).

> Under the circumstances here, the trial court did not abuse

20

its discretion in denying the motion to sever. The record shows that it considered the requisite factors set forth in *Ruff*, supra. Moreover, the record clearly supported the court's ruling given that the primary evidence against the three co-defendants came from the same sources: Link's testimony concerning his observations on the night of the shooting and Banks's admissions to the Hockadays. The jury was instructed on the law concerning mere presence, mere association, and parties to a crime. Further, the defendants' defenses were not antagonistic to each other. All three denied being present and did not shift the blame to each other. Finally, while Sims asserts that the 404(b) evidence did not involve him, Greer's testimony clearly implicates Sims in the Burke shooting. Sims has not carried his burden on appeal of showing that he was clearly prejudiced by the joint trial. Consequently, we see no abuse of discretion, and the trial court's denial of the severance motion will not be disturbed

9. Sims contends that the "trial court erred by admitting prejudicial statements attributed to Banks – over objection – which implicated Sims in violation of Sims's Sixth Amendment Right under the hearsay exception against co-conspirator [statements] through witness Cassandra Hockaday and Joseph Hockaday." Again, in his appellate brief, Sims makes bald assertions followed by black letter law, but he does not cite to a specific ruling by the trial court or to any pertinent facts, specific dates, or specific witness testimony from the trial transcript. At trial, the Hockadays testified at length and recounted numerous conversations they had with Banks, testimony which spans almost 400 pages of trial transcript. Moreover, Joseph Hockaday's three-hour-long, video-recorded statement to the police was played for the jury and the 100-page transcript of that interview was admitted in evidence. Sims has not identified with citation to the record specific excerpts from these sources. Moreover, Sims

21

offers no legal argument on the merits of his claim. At most, he contends that the trial court did not detail in its order denying the motion for new trial certain parts of its reasoning for admitting the statements. But, again, a trial court does not need to make specific findings of fact or conclusions of law when denying a motion for new trial, so that argument fails. See, e.g., *Carr v. State*, 275 Ga. at 187–88 (2002). Thus, for the same reasons set forth in Division 4, this claim of error fails. See also *McKoy*, 303 Ga. at 333.

10. Sims contends that his counsel provided constitutionally ineffective assistance in three respects: (a) counsel failed to object to inadmissible prior consistent statements made by the Hockadays; (b) counsel failed to object to the admission of evidence concerning Greer's immunity deal; and (c) counsel failed to make a *Bruton*[5] objection to the testimony of the Hockadays. To prevail on his claims of ineffective assistance of counsel, Sims must demonstrate both that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. See *Bates v. State*, 313 Ga. 57, 62 (2022) (citing *Strickland v. Washington*, 466 US 668, 687 (1984)). To establish deficient performance, Sims must show that trial counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. Establishing deficient performance

> is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [the appellant] bears the burden of overcoming this presumption. To carry this burden, he must

---

[5] *Bruton v. United States*, 391 US 123 (1968).

22

show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Park v. State*, 314 Ga. 733, 740–41 (2022) (citations omitted). To establish prejudice, Sims must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different. See *Bates*, 313 Ga. at 62 (2). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). "And, this burden is a heavy one." Id. at 62–63 (citation and punctuation omitted). "If an appellant fails to meet his or her burden of proving either prong of the Strickland test, the reviewing court does not have to examine the other prong." *Taylor v. State*, 315 Ga. 630, 647 (2023) (citation and punctuation omitted). Sims has not carried his burden of showing that counsel's performance was deficient.

(a) Once again, Sims has not identified in his brief with citation to the record exactly what testimony of the Hockadays required an objection but, rather, only asserts that the attorney should have "object[ed] to prior consistent statements" during their testimony. However, based on the trial court's order denying his motion for new trial, Sims appears to be referring generally to the admission of the recorded statements made by the Hockadays to the police. At the motion for new trial, Sims questioned trial counsel about Joseph Hockaday's videotaped statement, which was played for the jury. Counsel testified that he believed the video statement was helpful to the defense. He also believed that

23

Cassandra Hockaday's written statement was similarly beneficial. He wanted the jury to see the allegedly coercive conditions under which the Hockadays spoke to the police about Banks's admissions to them, and counsel made a strategic decision to allow the statements to be admitted for this reason. At trial, Joseph Hockaday was a reluctant witness and asserted that he was bullied into giving his statement because the police had threatened him and his wife with felony charges. Counsel testified that he did not object at trial "because of strategy" and that he wanted to "go through this statement with this witness" to demonstrate the Hockadays were allegedly coerced. Given counsel's well-founded and reasonable belief that Sims was best served by using the statement to his advantage instead of objecting to it, counsel's decision amounted to reasonable trial strategy that does not constitute deficient performance. See *Griffin v. State*, 309 Ga. 860, 867 (2020) (explaining that trial counsel was not deficient for failing to object to the introduction of evidence concerning defendant's racism because it was helpful to his defense to show that his racism and use of a racial slur triggered the victim to violently attack him).

(b) With respect to Greer's immunity deal, the trial court properly found that counsel did not perform deficiently, as counsel had a strategic reason for not objecting to evidence concerning Greer's immunity deal and instead to use it in cross-examination to undermine Greer's credibility. The prosecutor, during Greer's direct examination, read the agreement, including the term requiring Greer to testify truthfully. Banks cross-examined Greer at trial on the implications of the agreement, suggesting that Greer had a motive to lie and to implicate others to escape prosecution. Trial counsel testified that the immunity agreement hurt Greer's credibility because he received a significant benefit for his testimony. We cannot say that counsel's

24

strategy was so patently unreasonable that no competent attorney would have followed such a course. See id. Accordingly, counsel's performance in this regard was not deficient.

(c) Sims argues that counsel failed to make a *Bruton* objection to the testimony of the Hockadays. Again, Sims does not identify with citation to the record which specific statements were allegedly objectionable. We note, however, that none of Banks' admissions to the Hockadays can be considered testimonial because they were not intended for use in a future prosecution.

"*Bruton* held that a defendant's right to be confronted with the witnesses against him is violated when he is tried jointly with a co-defendant who does not testify, and the court admits an out-of-court statement by the co-defendant that directly inculpates the defendant." *Allen v. State*, 300 Ga. 500, 503 (2017). However, "the rule set forth in *Bruton* … does not apply to non-testimonial out-of-court statements made by such a co-defendant." *Billings v. State*, 293 Ga. 99, 103–104 (2013) (emphasis omitted). A statement is testimonial if its primary purpose is to establish evidence for use in a future prosecution, and that was clearly not the case here. See *Favors v. State*, 296 Ga. 842, 845 (2015). For these reasons, any objection to the admission of these statements on *Bruton* grounds would have lacked merit, and the failure to make a meritless objection is not deficient performance. See *Hayes v. State*, 262 Ga. 881, 884–85 (1993).

Because Sims has failed to show that his trial counsel's performance was deficient, his claim of ineffective assistance of trial counsel fails. See *Taylor*, 315 Ga. at 647.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*